JUDGE WOODS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

15 CV 02457

INTERNATIONAL TECHNOLOGIES MARKETING, INC.

                             *Plaintiff,*

      **-against-**

VERINT SYSTEMS, LTD., and VERINT SYSTEMS, INC.,

                             *Defendants,*

Case No.:

**COMPLAINT AND JURY DEMAND**

RECEIVED

MAR 31 2015

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, International Technologies Marketing, Inc. (hereinafter "**ITM**" or "**Plaintiff**") for its complaint against Defendants, avers:

## THE PARTIES

1.  ITM is a Florida corporation with its principal address at 170 SE 14th Street, Suite 2506, Miami, FL 33131.  ITM is in the business of providing IT and Security project consulting in addition to other services including M&A/Venture capital funding, Sales/Marketing and Strategic Business development.  ITM has substantial expertise in and business relationships with Brazil and the Brazilian market in various technology sectors, with special expertise in technology solutions/offerings in the Government Law Enforcement area.

2.  Upon information and belief, Verint Systems, Ltd. (hereinafter "**Verint Ltd**") is a company formed under the laws of Israel with its principal address at 33 Maskit Street, Hertzaliya, Israel, and is or was in the business of developing, manufacturing and selling telecommunications monitoring systems for law enforcement agencies and telecommunications providers.  Upon further information and belief, Verint Ltd is or was wholly owned and/or controlled by Verint Systems, Inc. (hereinafter "**Verint Inc**").  Verint Ltd and Verint Inc are hereinafter sometimes collectively referred to as ("**Verint**").

3.   Upon information and belief, Verint Inc is a corporation formed under the laws of the State of Delaware with its corporate headquarters located in Melville, NY; is in the business of selling software and hardware products for security, surveillance and business intelligence; has numerous clients in many countries; has offices in Israel and other countries in addition to its corporate headquarters in Melville, NY; and, has numerous employees in the United States and abroad.  Upon further information and belief, Verint Inc is the successor to and/or owns and/or controls both the assets and operations of Verint Ltd.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties hereto, and the amount in controversy exceeds seventy five thousand dollars ($75,000.00) exclusive of interest and costs.

5.   This Court has personal jurisdiction over the parties due to the parties' submission to the jurisdiction of this Court in the parties' agreement entered into by and between ITM and Verint Ltd dated as of February 22, 2006 (the "**Finder's Agreement**") over all disputes between the parties with respect to the Finder's Agreement and the subsequent amendments thereto.  Additionally defendant Verint Inc has its corporate offices in the State of New York and, upon information and belief, conducts significant business within the State.

6.   Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391.

7.   Section 9.1 of the Finder's Agreement, which applies to its subsequent amendments, provides that "This Agreement shall be interpreted in accordance with, and governed in all respects by the laws of [the, sic] New York, and the competent New York courts in the District of New York shall have exclusive jurisdiction over all disputes between the parties with respect to this Agreement."

2

## PRELIMINARY STATEMENT

8.  ITM and Verint Ltd are parties to the Finder's Agreement, as amended by Amendment No. 1 to the Agreement, dated as of September 11, 2006 (the "**First Amendment**"), and as subsequently further amended by Amendment No. 2 to Agreement, dated as of December 20, 2006 (hereinafter referred to as the "**Suntech Amendment**"). The Finder's Agreement, First Amendment, and Suntech Amendment are attached hereto as **Exhibits A, B and C**, respectively.

9.  The Finder's Agreement, as amended by the Suntech Amendment, was never terminated by either Party, and as such, is still valid and in full force and effect.

10.  The Finder's Agreement, as amended by the Suntech Amendment, provides for a substantial finder's fee to be paid by Verint to ITM upon Verint's purchase of Suntech (shares or assets).

11.  Pursuant to the Suntech Amendment, ITM expended many hundreds of hours and incurred substantial expenses across multiple geographies to bring about Suntech's acquisition by Verint.

12.  Verint, on its own admission, has completed the purchase of Suntech – a Provider of communications intelligence solutions for business and government in Latin America (the "**Suntech Acquisition**").

13.  Thus Verint is liable to ITM in the amount of **$1,126,000** (the "**Suntech Compensation**") arising out of the Suntech Acquisition pursuant to the compensation structure set forth in the Suntech Amendment.

## BACKGROUND FACTS

14.  ITM and its officers and employees possessed extensive business and technical expertise in the Brazilian market for technology security products including those focused on Law Enforcement and Intelligence Agencies. Tony Schehtman, President of ITM, has developed broad

business and government contacts in South America in general and Brazil in particular from his 12 years as a Silicon Valley Executive and has been part of the Florida State Governor's Trade mission to Brazil.   Mr. Schehtman is fluent in Portuguese and highly familiar with Brazilian business practices particularly as they relate to companies engaged in business and government security technologies, products and related industries.

15.   ITM in or about 2004, working on Brazilian Telecommunications Data analytics, determined that there was a significant business opportunity for large Security related companies to provide their solutions in South America and particularly Brazil if they could overcome local barriers to foreign companies doing business in that country, such as local protocol standards, local technology standards and Regulatory requirements. ITM's business plan was to create and broker an association between a large foreign company with state-of-the-art solutions and an existing Brazilian company within the compliance mandates already in place and with local Procurement contracts, thereby reducing the local barriers to business development and expansion for foreign solution providers, within that market.

16.   ITM through its President Schehtman and other principals held an exploratory meeting with NICE Systems Chief Operating Officer, in Israel in the late summer of 2005, Verint's main competitor and one of the world's biggest Technology solution providers for Law Enforcement Agencies. Not long after that, a similar conceptual exploratory meeting was held with Verint's Central & Latin America Manager, Hermann Kanter, in Fort Lauderdale FL in the fall of 2005. Kanter expressed strong interest in ITM's plan explaining that Verint had experienced a serious problem after making its first sale to the Brazilian Federal Police (see paragraph 19 below) – Kanter indicated he was moving on to a new company and referred Schehtman to Aron Dovrat, Kanter's successor and head of Verint sales in South America.  This kicked off discussions between ITM and Verint as to ITM's possible services to assist Verint in fixing its problems in Brazil, to obtain a toe-

hold and local presence there and to establish a revenue stream in the thriving Brazilian Law Enforcement Agency ("LEA") Security market. Despite its initial discussions with Nice Systems, ITM proceeded to make headway with Verint due partly to Verint's local presence in Fort Lauderdale Florida as well as its apparent willingness to collaborate.

17. One (well recognized strategy/method) of securing a clean entry for Verint into the Brazilian market was discussed and agreed to, namely, to develop product cooperation programs between Verint and local Brazilian companies whereby they could locally customize and resell Verint products, especially given that Brazilian regulations favored locally delivered solutions by indigenous Brazilian vendors.  ITM's first such project was to develop and promote a cooperative product sharing venture between Verint and Digitro, a Brazilian company with a product called GUARDIAO, dominating the Lawful Interception field for the local Judicial System under the Brazilian DPF (Federal Police).  This project resulted in the February 22, 2006 Finder's Agreement between ITM and Verint which provided compensation for ITM for its efforts on this project based on commissions for Verint product sales to or through Digitro.

18. In June 2006, Mr. Schechtman and other ITM representatives traveled to Israel to meet with Zvi Fishler, Verint's Executive VP for Worldwide Sales and Operations, and other Verint executives including Neri Brutzkus, Chief Technology Officer, to discuss ITM's strategy for Verint's entry into the Brazilian market.  Both the method of accomplishing this result through partnering with an existing Brazilian entity as well as the basis for ITM's compensation for its efforts on Verint's behalf were discussed in depth.

19. Promoting Verint in Brazil was made considerably more difficult by the fact that the Verint had previously attempted to make entry to the Brazilian market without correct strategy and planning, resulting in a single very messy sale to Brazil just prior to the time when ITM engaged with Verint.  It was a very well-known failure where the equipment Verint sold was installed in the key

Brazilian border town of Iguacu near Paraguay.   The Verint equipment was unable to work as advertised because allegedly the Verint product did not confirm to or even "interface" with the local Brazilian Federal Police phone interception standards used by the local Brazilian Telecommunications providers.   Upon information and belief, this well publicized failure fostered reluctance by potential Brazilian business and government clients to do business directly with Verint. In effect, Verint was unable to conduct business in Brazil for this critical market segment of Lawful Interception.

20.   As part of ITM's efforts to promote Verint's entry into the Brazilian market, ITM researched and discovered Suntech, a Brazilian company in the Telecommunications Security field, with a security platform called VIGIA.  From its research and contacts in Brazil, ITM determined that Suntech was a promising prospect for a cooperative effort with Verint in Brazil. The VIGIA platform was a de facto standard used by Brazilian Telecommunications providers to provide Lawful Interception Data to Law Enforcement, including the Brazilian Federal Police. Upon information and belief, Verint at this point had no contact with Suntech and was totally unaware of its potential as a partner in Brazil. Initial meetings with Suntech in Brazil showed that Suntech viewed Verint as a giant hostile competitor with a damaged reputation.

21.   In August 2006, as a result of ITM's significant efforts in brokering information and possible mutual value propositions, ITM succeeded in setting up meetings at Suntech HQ in Brazil which were attended by Mr. Schehtman and others for ITM, with Aron Dovrat and Zvi Fishler for Verint as well as the Board, Executive and Technical team of Suntech.   After many hours of deliberations and discussions, Verint and Suntech agreed to start an exploratory effort and determined to investigate joint product cooperation much like the one that had been discussed earlier with Digitro, which Digitro had ultimately rejected.

22.   As a result of the August meetings, ITM and Verint entered into the September 11, 2006 First Amendment to the Finder's Agreement, which essentially applied the terms of the initial Finder's Agreement, relating to Digitro, to Suntech.   Thus like the Finder's Agreement, the First Amendment pegged ITM's compensation to commissions on Verint's product and services sales (via and) to Suntech, in Latin America.

23.   As a result of ITM's efforts and the meetings between Verint and Suntech, the cooperative marketing plan between the companies soon morphed into an acquisition plan whereby Verint, the much larger Israeli company, would acquire the far smaller Brazilian company Suntech, stock or assets, thereby establishing a local presence so as to gain its entry to the Brazilian Government/Telecommunications security market.

24.   In connection with the acquisition plan, ITM assisted Verint and Suntech with due diligence inquiries, the preparation by both sides of appropriate non-disclosure agreements ("NDAs"), the exchange of financial information and the preparation by Verint of a proposed term sheet.

25.   On November 17, 2006, executive meetings were held in Virginia at the industry renowned Intelligence Support Systems ("ISS") World event with the pertinent Verint executives and key Suntech executives present as well as Mr. Schehtman.   At this meeting, Neri Brutzkus, Verint's CTO, presented Verint's initial merger and acquisition proposal.

26.   Shortly after the November meeting, Mr. Schehtman, President of ITM, requested Mr. Fishler, Sales Operations VP for Verint, to prepare a compensation agreement for ITM's services in connection with the acquisition plan since the First Amendment involving Suntech related to commission compensation based on a joint product promotion; as such that agreement was totally inapplicable to an acquisition.

27. Mr. Fishler, on behalf of Verint, did send a compensation agreement to Schehtman/ITM, now specifically tailored to the proposed Suntech acquisition; this provided compensation for ITM based on a percentage the payments made by Verint in the acquisition of Suntech stock or assets. The agreement, previously defined as the Second or Suntech Amendment to the original Finder's Agreement, was drafted by Verint and was dated as of December 20, 2006 – it was duly executed by both Verint and ITM.

28. On or about January 17, 2007, having reviewed and analyzed Verint's Acquisition terms, Suntech sent a counter-proposal to Verint with respect to the proposed acquisition terms. ITM was deeply engaged so as to facilitate that proposal and assure that it was done in the form that aided Verint's understanding of Suntech's terms.

29. Verint was slow to respond to the counter-offer. Upon information and belief, Verint became involved in another major acquisition, of Witness Systems, a company with Worldwide presence and larger than Verint itself.

30. In an attempt to reinvigorate the negotiations, ITM's Mr. Schehtman in late February 2007 traveled to Verint's offices in Israel to meet with Verint's Zvi Fishler and Neri Brutzkus. To Schehtman's surprise the Verint representatives stated that the Suntech acquisition was probably off. Later, Verint told ITM that in fact Suntech had also been informed by Verint that the acquisition was off. ITM was deeply disappointed by that development but, given the clear fit and efforts to date, continued to work to promote the project since ITM believed the project had merit and would be revisited by Verint in the future.

31. Subsequently, Suntech's CEO Mauricio Dobes informed ITM's Tony Schehtman that he had met with Verint's Neri Brutzkus (CTO) on May 30, 2007 at the ISS meeting in Washington, DC and was told that now that the Witness Systems acquisition was completed, Verint was ready to again move forward with the Suntech Acquisition. Verint never informed ITM that the Suntech

acquisition was moving forward. This back channel communication by Verint with Suntech was unusual since ITM initiated and acted as a conduit for communications on the Suntech Acquisition project. ITM at this point suspected Verint was operating in bad faith by concealing the renewed negotiations from it in the hope of avoiding ITM's compensation under Suntech Amendment. Nevertheless, negotiations on the acquisition began again with ITM inserted in the process through Suntech's initiative.

32.    Emails were exchanged between Verint and Suntech over the summer of 2007 in which ITM actively participated; discussions pertained to various mechanisms for a cooperative effort by the two companies by way acquisition and/or cross-product promotion. At the end of the summer, Verint for a second time represented that the Suntech Acquisition was off. This was in the form of a September 10, 2007 email from Aron Dovrat, VP in charge of Verint's Sales and Marketing for South America, to Mauricio Dobes, CEO of Suntech, stating "We suggest freezing further discussions on cooperation, unless there is very specific business opportunity to address." ITM was copied on that email.

33.    At this point ITM's suspicions that Verint was operating in bad faith to avoid ITM's compensation under Suntech Amendment were rekindled. Nevertheless, ITM continued to promote business projects between Verint and Suntech, including the Suntech Acquisition, and expanded its effort to international projects and alliances despite the "freeze" email referred to above. This in the belief that Verint at some point would need to continue the acquisition where it purportedly left off given its appetite for producing Revenues in Brazil, and there was no other apparent viable alternative to Suntech. ITM continued to inquire about progress on the Suntech Acquisition; and Verint continued to maintain that the acquisition was not going forward.

34.    ITM subsequently discovered that Verint's above representations were untrue. Thus, while Verint never directly informed ITM that the Suntech acquisition had taken place, ITM learned

through web postings by Suntech and SEC filings by Verint in 2011, that both Suntech and Verint acknowledged that Verint had indeed purchased Suntech in August 2011 through Suntech S.A. and Suntech Participacoes Ltda.  Attached as **Exhibit D** is a copy of a pertinent Suntech press release; and attached as **Exhibit E** is a copy of a portion of Verint's 2011 SEC filings.[1]  Verint's SEC filings indicate the acquisition price Verint paid for Suntech was $10.9 million at closing and additional future post-closing payments in the amount of $23 million.  Upon information and belief, Brazilian Corporate records indicate those post-closing payments have been completed.

35.    When ITM demanded compensation under the Suntech Amendment based on Verint's admitted acquisition of Suntech, Verint refused payment asserting, in part, the one year term of the product commission agreements in the Finder's Agreement and First Amendment despite their clear inapplicability to the acquisition transaction.

36.    For its service to Verint in promoting plans to get Verint access to the Brazilian market, including the acquisition of Suntech, ITM was never paid a dime.

37.    ITM's President, Tony Schehtman, spent hundreds of hours promoting Verint's entry into the Brazilian business security market, including principally the Suntech Acquisition.  Additionally, ITM incurred expenses on this project totaling approximately $350,000, including costs for travel to meetings in Israel, Florida, Washington DC and Brazil.  As a direct result of ITM's effort, the completion of the Suntech Acquisition has proven successful, yet Verint refuses to pay.

---

[1] Upon information and belief, Brazilian Court declarations and corporate filing records show Suntech was purchased by Jacou Holdings in 2011, which apparently was an entity controlled by Verint, and that Verint was not recorded as the purchaser of Suntech in the official Brazilian records until 2013.  In any event, both Verint's admissions in its 2011 SEC filings and the 2013 Brazilian records establish that Verint has, in fact, purchased Suntech outright, thus triggering Verint's obligation to pay the Suntech Compensation to ITM under the Suntech Amendment.

## PERTINENT AGREEMENTS

### The Finder's Agreement

38.   The scope of the February 22, 2006 Finder's Agreement is limited to Verint's "engage[ment] of [ITM] to assist [Verint] in the marketing and sale of the Products to the Customer." *See* Section 1.1 of the Finder's Agreement.

39.   The term "Customer" is defined in the preamble on page 1 of the Finder's Agreement as "Digitro from Florianoplis – SC".

40.   The term "Products" is defined in the preamble on page 1 of the Finder's Agreement as "telecommunications monitoring systems for law enforcement agencies."

41.   In exchange for ITM's efforts, ITM would receive a commission based upon sales of the Products to the Customer.  Section 3 of the Finder's Agreement provides that "[i]n consideration for his services pursuant to this Agreement the Finder shall be entitled to receive a <u>commission</u>, calculated as a percentage of the total net revenue to the Company <u>from sales of Products to the Customer</u>, in accordance with Appendix A of this Agreement...." *See* Section 3 of the Finder's Agreement (emphasis added).

42.   Section 1 of <u>Appendix A</u> of the Finder's Agreement limits the payment of Product commissions by Verint to ITM "for sales of its Products actually made to the Customer <u>during the term of this Agreement and for a period of six (6) months thereafter</u>....*See* <u>Appendix A</u> of the Finder's Agreement (emphasis added).

43.   Section 4 of <u>Appendix A</u> provides that "[t]he Finder shall have no right to <u>commissions</u> and no <u>commissions</u> shall be payable on <u>sales of any Products</u> to the Customer made after the term of this Agreement." *See* <u>Appendix A</u> of the Finder's Agreement (emphasis added).

11

44.   The Finder's Agreement originally provided for a term of twelve (12) months commencing upon February 22, 2006.  *See* Section 8 of the Finder's Agreement.

### The First Amendment

45.   The First Amendment, entered into as of September 11, 2006, expanded the definition of "Customer" to include 'SUNTECH, a Brazilian company. "  *See* Section 2 of the First Amendment.

46.   Section 2 of the First Amendment specifically incorporated the terms and conditions of the Finder's Agreement relating to the sale of Products, providing that "*the provisions of the [Finder's] Agreement, including but not limited to Exhibit A, shall apply in addition with regard to SUNTECH…*"  *See* Section 2 of the First Amendment (emphasis added).

47.   No other changes were made to the Finder's Agreement by the First Amendment.

### The Second Amendment (referred to herein as the "Suntech Amendment")

48.   The Suntech Amendment was entered into on December 20, 2006 – just two (2) months before the end of the initial twelve (12) month term of the Finder's Agreement.  It was drafted by Verint to grant ITM's request for protection to insure ITM was properly compensated for the extensive services and expenses it was undertaking to promote the Suntech Acquisition on behalf of Verint.

49.   The Suntech Amendment substantially broadened the scope and term of the very limited Finder's Agreement and First Amendment and effectuated a complete overhaul of the nature and scope of the relationship between Verint and ITM.

50.   Under the Suntech Amendment, ITM was engaged as a "finder" for the acquisition by Verint of Suntech stock or assets and would be paid compensation based on a percentage of the purchase price for the acquisition – a wholly different type of transaction from the product

commissions set forth in the original Finder's Agreement and the First Amendment. *See* Section 2 of Suntech Amendment.

51. Specifically, Section 2 of the Suntech Amendment provides that:

> *Finder [ITM] shall make best commercial efforts to assist and support Company [Verint] in its activities regarding the purchase of (shares or assets) of SUNTECH (the "Purchase"). In the event that the Company completes the Purchase of SUNTECH, Finder **shall** be entitled to the following **compensation**:*
>
> > *(i) With regard to the payment that may be made by Company to SUNTECH at the Purchase Closing, Company shall pay Finder 4% of such payment.*
> >
> > *(ii) With regard to any payment for the Purchase made subsequent to the Closing, Company shall pay finder 3% of any such subsequent payment.*
>
> *Such compensation shall be in lieu of any other compensation otherwise set forth in the [Finder's] Agreement or the First Amendment.*

*See* Section 2 of Suntech Amendment (emphasis added).

52. Contrary to the Finder's Agreement and the First Amendment, the Suntech Amendment does not limit or qualify the time during which the Suntech Acquisition had to take place in order for the "compensation" to be paid, whereas the Finder's Agreement, and Appendix A thereto (which was again referenced specifically in the First Amendment), expressly limited the payment of product sale commissions to Products sold to Customers (Digitro in the February 22, 206 Finder's Agreement and Suntech in the September 11, 2006 First Amendment) during the term of the Agreement and for six (6) months thereafter.

53. Pursuant to the language of the Suntech Amendment, in addition to the drastic reformulation of the nature and scope of the relationship between Verint and ITM from basic Product promotion to strategic business finder, the parties amended the term of the initial Finder's Agreement from a twelve (12) month term to one that continued until the "Purchase" (be it company ownership or assets) by Verint of Suntech could be completed.

54.  The Suntech Amendment uses absolute language denoting a mandatory payment obligation upon the purchase by Verint of Suntech namely:  *"In the event that the Company completes the Purchase of SUNTECH, Finder **shall** be entitled to the following **compensation**."  See* Section 2 of Suntech Amendment (emphasis added).  As such, the payment condition in the Suntech Amendment is absolute in the face of a completed purchase.

55.  Upon information and belief, industry norms for the closing of the kind of cross-border acquisition transaction contemplated by the parties in the Suntech Amendment are characterized by a long-term effort, including significant due diligence, extensive contract negotiations, and possible regulatory approvals – which could not possibly be completed in the two (2) month period between the execution of the Suntech Amendment [December 20, 2006] and expiration of the one year term of the initial Finder's Agreement [February 22, 2007].

56.  In February-March 2007, Verint sent ITM a proposed Third Amendment to the original Finder's Agreement, specifically dealing with Verint product sales tied to the Rio de Janeiro State Security Committee. This proposed agreement was structured as a product sale commission agreement much like the original Verint/ITM product sales commission agreement relating to Digitro and the First Amendment relating to Suntech product commissions.  The proposed Third Amendment was not an acquisition finder's agreement like the Second or Suntech Amendment nor did it purport to alter or terminate the Suntech Amendment.  In any event, neither of the parties signed that document, it never became operative and, *a fortiori*, it did not amend the term of the Suntech Amendment governing the finder's fee for the Suntech Acquisition.

57.  Discussions among ITM, Verint, and Suntech regarding the Suntech Acquisition, and ITM'S "best commercial efforts to assist and support" Verint in connection with its purchase of Suntech, continued well after February 22, 2007 – the end of the initial 12 month term of the Finder's Agreement.

14

## ITM's Introduction of Suntech to Verint and
## Commercial Efforts to Assist and Support the Suntech Acquisition

58.   ITM's activities were clearly instrumental in effectuating the Suntech Acquisition by Verint.

59.   ITM identified Suntech and its technology as a possible acquisition target to Verint. ITM signed engagements with Verint at the expense of Verint's main rival, NICE Systems, who was also interested in a similar engagement. Upon information and belief, Verint had no prior knowledge of Suntech and its technology before the introduction of Suntech by ITM and moreover, was in a poor situation with damaged reputation in Brazil at the time of the introduction.

60.   ITM undertook all the effort and groundwork so as to be able to make the initial introductions a success, facilitating meetings between Verint and Suntech Directors/Executives in Brazil, including Mauricio Dobes, Ricardo Moritz and Ana Claudia de Brito, which started the Suntech Acquisition forward.

61.   ITM coordinated due diligence sessions, and other meetings that were critical to building a foundation for the relationship, which led to the Suntech Acquisition, and performed further supporting activities in accordance with the Suntech Amendment.

62.   ITM created and delivered presentations to Verint and Suntech, coordinated and participated in meetings in Florida, Washington, D.C., Israel, and Brazil, coordinated and participated in conference calls, and provided overall support for the ultimate Suntech Acquisition by Verint.

63.   Verint delivered a term sheet to Suntech and that term sheet was negotiated by the parties, with the assistance of ITM, in 2006 and 2007.

64.   As noted in paragraph 37 above, ITM made a significant investment of effort and resources over a considerable period of time in order to perform its duties and obligations under the Suntech Amendment and incurred significant expenses amounting to approximately $350,000.

65.  In addition to the foregoing direct efforts by ITM in support of the Suntech Acquisition, including due diligence activities and negotiations regarding the Term Sheet and related discussions, ITM undertook indirect efforts to facilitate a multitude of commercial business relationships and partnerships between Verint and Suntech and their various product lines and distribution channels that would drive the parties together toward an acquisition by Verint.  ITM highlighted and familiarized Verint and Suntech with their respective synergies and complementary strengths to create compelling conditions for such a transaction and working towards creating a tangible pipeline of international sales tractions, working with numerous Partners and Associates located in various geographies ranging from South America to Russia -- always with the primary goal by ITM of supporting Verint's ultimate acquisition of Suntech.

### Completion of Verint's Acquisition of Suntech

66.  As noted in paragraph 34 above, Verint in its 2011 and 2012 SEC filings has admitted that it did in fact purchase Suntech thereby triggering its obligation to compensate ITM under the terms of the Finder's Agreement, as amended by the Suntech Amendment. (See Exhibit E and the Suntech press release, Exhibit D.)

### FOR ITS FIRST CLAIM FOR RELIEF:
(Breach of Contract)

67.  Repeats and realleges each and every averment contained in paragraphs 1 through 66 hereof.

68.  The Suntech Amendment is a valid and binding agreement between ITM and Verint, enforceable in accordance with its terms, and has not been terminated by either party.

69.  ITM has fully performed its obligations and undertakings pursuant to the Suntech Amendment and fully complied with all material terms and conditions contained therein by,

undertaking the following supporting activities among others: (a) identifying Suntech and its technology as a possible acquisition target to Verint; (b) making the initial introductions and facilitating meetings between Verint and Suntech senior executives; (c) coordinating due diligence sessions, and critical meetings and conference calls; (d) creating and presenting presentations, strategies, plans and proposals; (e) participating in the exchange of term sheets; (f) providing overall support to facilitate the Suntech Acquisition; and (g) providing indirect efforts to facilitate the Suntech Acquisition by promoting cooperative product initiatives between Verint and Suntech across diverse global markets and across numerous strategic alliance and reseller partners for the joint effort.

70. ITM utilized its best commercial efforts to assist and support Verint in its activities regarding the Suntech Acquisition in accordance with the Suntech Amendment and expended a significant investment of time, effort, and resources, including incurring expenses of approximately $350,000, in order to perform its duties and obligations under the Suntech Amendment.

71. The Suntech Amendment is certain and specific, and mandates payment of the Suntech Compensation to ITM in the event that Verint completed the purchase of Suntech, in accordance with the compensation structure set forth therein.

72. Upon Verint's own admission, Verint has completed the purchase of Suntech and under the compensation formula set forth in the Suntech Amendment, Verint is liable to ITM for $1,126,000, plus interest from the date the Suntech acquisition occurred in 2011.

73. ITM has duly demanded payment from Verint for $1,126,000, plus interest, and Verint has wrongfully refused in breach of its contract with ITM.

### FOR ITS SECOND CLAIM FOR RELIEF:
(Breach of Covenant of Good Faith and Fair Dealing)

74. Repeats and realleges each and every averment contained in paragraphs 1 through 73 hereof.

75. Further to the Finder's Agreement, as amended by the Suntech Amendment, Verint was bound by an implied covenant of good faith and fair dealing.

76. Under the covenant of good faith and fair dealing, Verint was precluded from taking any action that would impair the value of (plaintiff) ITM's interest in the Suntech Amendment and the Suntech Compensation required to be paid thereunder.

77. Upon information and belief, Verint breached the implied covenant of good faith and fair dealing by deliberately misrepresenting and/or concealing from ITM that the Suntech Acquisition was going forward and, indeed, was ultimately consummated. ITM repeatedly asked Verint the status of the Suntech Acquisition and was repeatedly told by Verint that the Suntech Acquisition was not going forward. Upon information and belief, these repeated denials by Verint were either knowingly false when made or remained uncorrected by Verint after it learned that its representations were untrue.

78. Verint breached the Covenant of Good Faith and Fair Dealing by attempting to circumvent ITM through its back-door re-engagement with Suntech Executives in May 2007 at the ISS meeting in Washington, D.C. without contacting or advising ITM of its intent to continue with the M&A process, but rather, to approach Suntech directly, all as noted in paragraph 31 above.

79. Likewise, Verint breached the Covenant of Good Faith and Fair Dealing by attempting to circumvent ITM through its re-engagement with Suntech Executives following the September 10, 2007 "freeze email" referred to in paragraph 32 hereof without contacting or advising ITM of its intent to continue with the M&A process.

80. Additionally, Verint breached the implied covenant of good faith and fair dealing by refusing payment based on the fallacious assertion that the Suntech Amendment was subject to the one year term in the initial Finder's Agreement despite the fact there is no language in the Suntech Amendment, which was drafted by Verint, to support such a claim; and, that the one year limitation

on commissions for product sales in the product promotion ventures covered by the initial Finder's Agreement (relating to Digitro) and the First Amendment (relating to Suntech) simply was inapplicable to an M&A transaction such as the Suntech Acquisition.

81.  Although ITM has made demand on Verint for payment of the Suntech Compensation due under the Suntech Amendment, Verint has refused and the Suntech Compensation remains due and owing to ITM.

82.  Due to the foregoing, as a result of Verint's breach of the covenant of good faith and fair dealing, ITM has been damaged in an amount to be determined at trial but not less than $1,126,000, plus interest from the date of the closing.

**FOR ITS THIRD CLAIM FOR RELIEF:**
(Unjust Enrichment)

83.  Repeats and realleges each and every averment contained in paragraphs 1 through 82 hereof.

84.  Although duly demanded, Verint has failed and refused to pay to ITM the compensation required by the Suntech Amendment despite completing the purchase of Suntech. Verint claims that the Suntech Amendment is not enforceable for various reasons that ITM regards as totally specious.   Moreover, even assuming arguendo that the Suntech Amendment was unenforceable, which ITM vigorously rejects, Verint would be liable in quantum meruit to pay the reasonable value of ITM's efforts on its behalf.

85.  At Verint's request and with Verint's knowledge and acquiescence, ITM has rendered hundreds of hours of services by persons highly experienced in Brazilian business and government procurement practices and has incurred expenses amounting to approximately $350,000, all in promoting Verint's entry into the Brazilian business and government security related market,

principally through the Suntech Acquisition.  ITM's services have proven to be highly effective culminating in Verint's acquisition of Suntech.

86.  Upon information and belief, the Suntech Acquisition has provided Verint with subsidiary presence in Latin America/Brazil (see the subsidiary list from Verint's 2012 and 2014 10Ks attached hereto as Exhibit F) and most importantly, a significant incremental revenue stream for Verint, exactly as was originally planned and designed by ITM and strategized in planning discussions with Verint; thus enabling significant incremental Revenue for Verint from Brazil (a previously unproductive Region for Verint) as well as a Return on Investment for Verint, since the transaction was completed also enabling Verint to cross sell with its traditional products into the Brazilian market which, prior to the acquisition, was all but impossible.

87.  The expectation, as supported by the Suntech Amendment whether or not it is technically enforceable (which ITM strongly contends it is), is that both ITM and Verint believed and intended that ITM would be paid a reasonable amount for its services particularly if they culminated in a successful transaction, which they clearly did.

88.  By reason of the foregoing, Verint has been and continues to be unjustly enriched to the detriment of ITM.  It would be inequitable to permit Verint to retain the benefit it has obtained from ITM's services rendered and expenses incurred in connection with the Suntech Acquisition while making no payment for same.

89.  Due to the foregoing, ITM is entitled to recover the full amount by which Verint has been unjustly enriched to the detriment of ITM.

90.  The amount of ITM's recovery against Verint is to be determined at trial based on the value of the services provided and expenses incurred by ITM, taking into account, among other things, the incremental revenue stream to Verint, access to the Brazilian market that Verint obtained through the Suntech Acquisition and the Cross Selling of Verint and Suntech products Worldwide.

**WHEREFORE,** plaintiff ITM respectfully demands the entry of judgment against defendants Verint as follows:

    A.  On the FIRST CLAIM FOR RELIEF for Breach of Contract, plaintiff ITM demands judgment against defendants Verint in the amount to be determined at trial, but not less than $1,126,000, with interest from the date of closing;

    B.  On the SECOND CLAIM FOR RELIEF for Breach of the Covenant of Good Faith and Fair Dealing, plaintiff ITM demands judgment against defendants Verint in the amount to be determined at trial but not less than $1,126,000, with interest from the date of closing;

    C.  On the THIRD CLAIM FOR RELIEF for Unjust Enrichment, plaintiff ITM demands judgment against defendants Verint in the amount by which defendants were unjustly enriched to be determined at trial, based on the value of the services provided and expenses incurred by ITM, taking into account, among other things, the incremental revenue stream and access to the Brazilian and International markets that Verint obtained through the Suntech Acquisition;

    D.  An award to plaintiff ITM and against defendants Verint of all costs, expenses and disbursements, including reasonable attorneys' fees, incurred by the plaintiff ITM in this action; and

    E.  An award to plaintiff ITM of any other or further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff ITM demands trial by jury in this action of all issues so triable.

Dated:  New York, NY
        March 31, 2015

HOLLYER BRADY LLP
Attorneys for Plaintiff ITM

A. Rene Hollyer, Esq., Partner
60 East 42nd Street, Suite 1825
New York, NY 10165
(212) 706-0248, Ext. 1805
*Bar #:  AH0295*

# EXHIBIT A

*Commercial Confidential*

## AGREEMENT

Made this 22 day of February 2006, between **Verint Systems, Ltd.** of 33 Maskit Street, Herzliya ISRAEL (hereinafter, the **"Company"**), and **International Technologies Marketing Inc.,** of **1000 South Pointe Drive Suite 1604, Miami Beach FL 33139** (hereinafter, the **"Finder"**).

**Whereas**      the Company develops, manufactures and sells telecommunications monitoring systems for law enforcement agencies (hereinafter, the **"Products"**); and

**Whereas**      the Finder has capability to assist in marketing the Products and establishing commercial relations to Digitro from **Florianópolis - SC** Rua Professora Sofia Quint de Souza, 167 - Capoeiras in Brazil that might be interested in the Products (the "Customer"); and

**Whereas**      subject to the terms and conditions set forth in this Agreement, the Company wishes to utilize the services of the Finder to assist it in selling the Products to the Customer;

**Now therefore in consideration of parties' mutual obligations and undertakings, the parties hereto have agreed as follows:**

**1.    Scope of Agreement**

1.1    The Company hereby engages the Finder to assist it in the marketing and sale of the Products to the Customer, and the Finder hereby agrees to render such assistance, all subject to the provisions set forth in this agreement.

1.2    The Finder will use its best commercial efforts to assist the Company's marketing objectives. The Finder assistance shall be by means of making an introduction between the Company and the Customer, recommending the Company to the Customer and assistance in the negotiations between the Company and the Customer, all in accordance to Company's instructions.

1.3    In the event of successful negotiations between the Company and the Customer, the sale of the Products to the Customer shall be made directly by the Company in accordance with the terms agreed by the Company and the Customer, without the Finder being a contracting party to the sale transaction. The Company shall have full discretion to decide whether or not to sell any Products to the Customer.

1.4    The Company shall provide the Finder with reasonable and appropriate materials and assistance regarding the Products and the Company, reasonably required to the performance of his obligations as set forth herein.

*Commercial Confidential*

**2.** **Responsibilities of Finder**

Notwithstanding any provisions of this Agreement or any authorizations expressed or implied herein, the Finder shall:

2.1 Bear all the expenses incurred by it in the performance of his obligations as set forth herein, and work at its own risk.

2.2 Comply with all necessary governmental approvals, licenses, and permits applicable to his activities pursuant to this Agreement.

2.3 Not be authorized or empowered to make any firm commitment, obligate, or give any warranties on behalf of the Company.

2.4 Not assist any person or entity in the marketing or sale of any products that are competitive in application or similar in their function to the Products, during the term of this Agreement and for a period of 6 months after its termination for any reason.

2.5 Comply with the provisions of the US Foreign Corrupt Practices Act, as those are set forth in Appendix B hereto which forms an integral part of this Agreement.

**3.** **Consideration**

In consideration for his services pursuant to this Agreement the Finder shall be entitled to receive a commission, calculated as percentage of the total net revenue to the Company from sales of Products to the Customer, in accordance with Appendix A of this Agreement (the "**Finder's Fee**") In case the Customer payments are divided into a schedule, the Finder will receive the Finder's Fee against receipt by the Company of the payments on a pro rata basis. The fee shall be paid in US Dollars.

**4.** **Confidential Information**

All information, whether commercial, business, technical or any other information of the Company, which now or hereafter is in the Finder's possession or will be furnished to him by the Company (hereinafter the "**Information**"), shall be deemed to have been furnished in confidence and for use by the Finder only in connection with this Agreement. Finder will take all reasonable steps to hold all the Information in confidence and to prevent the disclosure thereof to any third party without the prior written direction or approval of the Company.  All the Information will remain the property of the Company and upon the expiration or termination of this Agreement, will be returned to the Company.

**5.** **Proprietary Rights and Marks**

Finder acknowledges and agrees that all proprietary rights in the Products and documents therefor, including but not limited to patents, copyrights and trademarks, are and shall remain at all times the exclusive property of the Company. Finder shall not have or acquire any right, title or interest in the trademarks, or in the goodwill thereof

*Commercial Confidential*

### 6.   Independent Contractor Relationship

The Finder shall act as an independent contractor of the Company and nothing contained in this Agreement shall be deemed to create any employment, agency, joint venture or partnership relationship between the parties hereto.

### 7.   Limitation of Liability

The Company's sole obligation under this Agreement will be to pay Finder the Finder's Fee under the terms and conditions contained above. No other payment or reimbursement will be due or payable to Finder hereunder. In no event will the Company be liable to the Finder for any business expenses, loss of profits, or incidental, indirect or consequential damages.

### 8.   Term

This agreement shall be effective from the date hereof and shall continue in effect for a period of 12 months thereafter. This agreement may be terminated at any time by the Company with prior written notice not less than 30 days prior to termination.

### 9.   Miscellaneous

9.1   This Agreement shall be interpreted in accordance with, and governed in all respects by, the laws of the New York, and the competent New York courts in the District of New York shall have exclusive jurisdiction over all disputes between the parties with respect to this Agreement.

9.2   This Agreement contains the entire agreement between the parties respecting the subject matter hereof, and supersedes and replaces all previous agreements, understandings, commitments or arrangements, oral or written, with respect thereto. This Agreement may not be modified except by a written instrument executed by both parties.

9.3   Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

9.4   In performing this Agreement, Finder shall comply with all applicable laws, rules and regulations of the territories in which Finder's activities hereunder are to be performed and shall indemnify, defend and save the Company harmless from Finder's failure to do so. Without limiting the foregoing Finder agrees that in carrying out its responsibilities under the Agreement, (i) Finder will comply fully with the export control laws and regulations of the United States and Israel with respect to the commercial and technical data and information supplied by the Company, and (ii) Finder and its employees and agents have not and will not make or promise to make any payment in violation of the U.S. Foreign Corrupt Practices Act or similar law of Israel or any jurisdiction in the Territory and no owner, partner, officer, director or employee of the Finder or of any affiliate company of the Finder is or will become an official or employee of any government during the term of this

*Commercial Confidential*

Agreement without the prior written approval of the Company. Finder shall conduct its activities pursuant to this Agreement in a manner that will reflect favorably on the Company, and shall avoid any deceptive or misleading practice.

9.5    All notices required hereunder shall be given in writing either by personal delivery or by registered mail or facsimile. Notice shall be effective as of the date of the facsimile transmission, provided its receipt was confirmed by the other party, on the date of delivery in the case of personal delivery, or five days following the date upon which it was deposited for certified mail delivery, addressed to the party intended at its address set forth above (unless such address was previously changed by written notice given by that party).

**In witness whereof the parties have signed this Agreement:**

Tony Sekhman
President, IAM
2/23/06

Vibeke Danko, Adv.
General Counsel
Verint Systems Ltd.
March 1 2006

VERINT SYSTEMS LTD.

Z. Fischler
VP Marketing & Sales
March 13, 2006

3 - 1

*Commercial Confidential*

## APPENDIX - A

### FINDERS FEE

1.   The Company shall pay Finder commissions equaling **5% (Five Percent)** of the net invoice price on sales of its Products actually made to the Customer during the term of this Agreement and for a period of six (6) months thereafter, unless this Agreement was terminated due to Finder's breach. In the event that Company purchases Customer, then sales during this period via Customer (even after such acquisition) shall be covered under the terms of this Agreement. No commission shall be paid for the following Support and Maintenance Contract sales to the Customer.

2.   The "net invoice price" for the purposes of this Appendix A shall be the F.O.B invoice price less all sales and use taxes, duties and customs, licenses, insurance, transportation, freight charges, and handling charges, and trade discounts and allowances for returns.

3.   Commissions shall be payable to the Finder's account within 30 days of the actual receipt of customer's payment and against legal invoice for that part of the commission. In the event of partial payment by a customer, Finder shall be entitled to a pro-rata portion of the commission.

4.   The Finder shall have no right to commissions and no commissions shall be payable on sales of any Products to the Customer made after the term of this Agreement.

*Commercial Confidential*

## APPENDIX – B

### U.S. Foreign Corrupt Practices Act

1. The U.S. Foreign Corrupt Practices Act (the "FCPA") makes it unlawful to offer, pay, promise or authorize to pay any money, gift or anything of value, directly or indirectly: (i) to any Government Official (as defined below) or any foreign (non-U.S.) political party or (ii) to any person while knowing or suspecting that the payment or gift will be passed on to a Government Official, in connection with any business activity of Verint Systems Inc. or its wholly or partially owned affiliates (collectively "Verint") in order to obtain or retain business or to secure any improper advantage. For the purpose of this Agreement, the term "Government Official" means any employee or officer of a government including any national, regional or local department, agency, or enterprise owned or controlled by a government, any official of a political party, any official or employee of a public international organization, any person acting in an official capacity for, or on behalf of, such entities, and any candidate for foreign political office.

2. Representations, Warranties and Covenants of Representative. The Finder makes the following representations and warranties to the Company, and covenants and agrees as follows:

    a. Public and Commercial Bribery Representations, Warranties and Covenants of Representative. The Representative hereby represents, warrants and covenants that it has not, and covenants and agrees that it will not, in connection with this Agreement and any services performed by the Representative in connection herewith, make or promise or offer to make any payment or transfer of anything of value, directly or indirectly: (i) to any Government Official or government employee (including employees of government-owned entities or corporations); or (ii) to any political party, official of a political party or candidate (or to an intermediary for payment to any of the foregoing) in order to obtain or retain business or to secure any improper advantage. It is the intent of the parties that no payments or transfers of value shall be made that have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business.

    b. Policy Certifications. The Finder will, for itself and for each of its directors, officers, employees, agents or other representatives who have any direct involvement with the performance of this Agreement, certify that the Finder (or any of such persons) has not, and to its knowledge no other person, including but not limited to every director, officer, employee, representative, and agent of the Finder, has made, offered to make or agreed to make any loan, gift, donation or other payment, directly or indirectly, whether in cash or in kind to any Government Official or political party, in order to secure or to retain business or for any improper purpose. A sample Certification is attached as Exhibit A.

    c. Continuing Obligation to Advise. The Finder agrees that should it learn of or have reason to suspect or know of: (i) any such payment, offer, or agreement to make a payment to a Government Official, political party, or political party official or candidate for the purpose of

*Commercial Confidential*

obtaining or retaining business or securing any improper advantage; or (ii) any other development that in any way makes inaccurate or incomplete the representations, warranties and certifications of the Finder hereunder given or made as of the date hereof or at any time during the term of this Agreement, the Finder will immediately advise company representative of such knowledge or suspicion and the entire basis known to the Finder therefor.

d. <u>No Governmental Ownership of Finder.</u> The Finder hereby represents and warrants to the Company that no Government Official has any ownership interest, direct or indirect, in the Finder or in the contractual relationship established by this Agreement. In the event that during the term of this Agreement there is acquisition of an interest of any sort or nature, direct or indirect, in the Finder or in this Agreement by a Government Official, the Finder covenants and agrees to make immediate, complete and accurate written disclosure of such acquisition to the Company.

e. <u>Company Audit Right.</u> In order to verify compliance with the provisions of this Agreement, the Finder agrees that the Company shall have the right, upon reasonable written notice, to audit the books and records of the Finder to the extent such books and records relate to the performance of this Agreement and any payments made under this Agreement. The Finder agrees to furnish promptly to the Company any additional information the Company may reasonably request to verify the Finder's compliance with the provisions of Section 2.1.

f. <u>Disclosure of Agreement.</u> The Finder agrees that full disclosure of this Agreement may be made at any time and for any reason to the United States government and its agencies, and to any other person the Company's General Counsel determines has a legitimate need to know.

g. <u>Rights Upon Default.</u> In the event that the Company should believe, in good faith, that the Finder has acted or failed to act in any way that may subject the Company to liability under the FCPA (which action or failure to act is, hereinafter, an "FCPA Default"), the Company shall have the unilateral right, exercisable immediately upon written notice to the Finder:

    i. to refuse to consummate any transaction contemplated by this Agreement; and/or

    ii. to terminate this Agreement immediately pursuant to such material breach.

*Commercial Confidential*

### Exhibit A

## CERTIFICATION OF COMPLIANCE

I, [name], a duly authorized representative of Tony Selehhma (the "Finder") do hereby certify for and on behalf of the Finder, that neither I, nor to my knowledge any other person, including but not limited to every officer, director, stockholder, employee, representative and agent of Finder, has made, offered to make, or agreed to make any loan, gift, donation or payment, or transfer of any other thing of value directly or indirectly, whether in cash or in kind, to or for the benefit of any "Government Official" or political party to obtain or retain business or to secure any improper advantage for Verint Systems Inc. or any of its subsidiaries. "Government Official" is defined as:

(1) any employee or officer of a government, including any national, regional or local department, agency, or enterprise owned or controlled by a government;

(2) any official of a political party;

(3) any employees official of a public international organization;

(4) any person acting in an official capacity for, or on behalf of, such entities; or

*(5) any candidate for political office.*

I will immediately advise Doron Arazi or Vibeke Dank should (i) I learn of any of the prohibited activities described above, or (ii) if there are any changes in the ownership or control of the Finder.

I hereby confirm that neither I nor anyone else at the Finder is a Government Official.

[Finder]
(Finder's name)

Date: 2/28/56                          By:

Name: Tony Selehhma Izay
Title: President

# EXHIBIT B

*Commercial Confidential*

## AMENDMENT TO AGREEMENT

This Amendment to the Agreement is made this 11 September 2006 by and between Verint Systems Ltd. ("Company") with offices at 33 Maskit Street Herzliya Israel and International Technologies Marketing Inc., of 1000 South Pointe Drive Suite 1604, Miami Beach FL 33139 ("Finder").

**WHEREAS**    the parties signed an agreement on   22 day of February 2006 according to which the Finder has capability to assist in marketing the Products and establishing commercial relations with the Customer as set forth in the agreement ("**Agreement**"); and

**WHEREAS**    the Parties wish to amend certain terms of the Agreement as set forth in this Amendment.

**THEREFORE** in consideration of this preamble, the Parties hereby agree as follows:

1.  Unless specifically stated in this Amendment, the definition of terms as stated in the Agreement will apply for this Second as well.

2.  The Parties hereby agree to add the following provisions to the Agreement:

    *"Finder shall assist Company in its efforts in establishing a business relationship with SUNTECH, a Brazilian company. Furthermore, the provisions of the Agreement, including but not limited to Exhibit A, shall apply in addition with regard to SUNTECH, however the commission for transactions with SUNTECH shall be 5% percent, and not as stated in the Agreement. "*

3.  Except as specifically included herein, all terms and conditions of the Agreement will continue to apply to between the parties.

IN WITNESS WHEREOF, the parties have executed this Amendment in duplicate:

**Company**                                              **Finder**

Signature: _____                Signature: _____

Name:    Aron Dovrat                             Name: Tony Schlachman

Title: Sales Director                                Title: President /ITM

Date: 18/Sep/06                                     Date: 9/12/06

*1 of 1 pages*

# EXHIBIT C

*Commercial Confidential*

## AMENDMENT NO. 2 TO AGREEMENT

This **Second Amendment** to the Agreement is made this 20th December 2006 by and between Verint Systems Ltd ("Company") with offices at 33 Maskit Street Herzliya Israel and International Technologies Marketing Inc., of 1000 South Pointe Drive Suite 1604, Miami Beach Fl. 33139 ("Finder").

**WHEREAS**      the parties signed an agreement on 22 day of February 2006 according to which the Finder has capability to assist in marketing the Products and establishing commercial relations with the Customer as set forth in the agreement ("**Agreement**"); and

**WHEREAS**      the parties signed an Amendment on 11th day of September 2006 which regards to a special arrangement for the Finder's activities with regard to the Suntech ("**First Amendment**"); and

**WHEREAS**      the Parties wish to amend certain terms of the First Amendment as set forth in this Second Amendment

**THEREFORE** in consideration of this preamble, the Parties hereby agree as follows:

1. Unless specifically stated in this Second Amendment, the definition of terms as stated in the Agreement and the First Amendment will apply for this Second Amendment as well

2. The Parties hereby agree to add the following provisions to the Agreement:

   *'Finder shall make best commercial efforts to assist and support Company in its activities regarding the purchase (shares or assets) of SUNTECH (the "Purchase') In the event that the Company completes the Purchase of SUNTECH, Finder shall be entitled to the following compensation*
   - *(i)*     *With regard to the payment that may be made by Company to SUNTECH at the Purchase Closing, Company shall pay Finder 4% of the such payment*
   - *(ii)*    *With regard to any payment for the Purchase made subsequent to the Closing, Company shall pay finder 3% of any such subsequent payment*
   
   *Such compensation shall be in lieu of any other compensation otherwise set forth in the Agreement or the First Amendment.*

3. Except as specifically included herein, all terms and conditions of the Agreement will continue to apply to between the parties.

IN WITNESS WHEREOF, the parties have executed this Amendment in duplicate:

Company                              Finder

Signature: _____            Signature:_____

       VERINT SYSTEMS LTD

*1 of 2 pages*

        Vibeke Dank, Adv.
         General Counsel
        Verint Systems Ltd.

DEC-20-2006 13:07 From:                                To:972 99624747        P.3/3

*Commercial Confidential*

Name: __E. FISCHLER__                    Name: __Tony Sclechter__

Title: __VP Sales & Mcketing__          Title: __President__

Date: __20/12/2006__                     Date: __20/12/2006__

**VERINT SYSTEMS LTD.**

# EXHIBIT D

<u>English</u>    Español    Português    Customer Care Sign In        Suntech Society log in
If you are not a member, sign up

**Solutions    Clients    Associations    Partnerships    Press & Events    About us    Contacts**                    Search

# Press & Events

Events    Press    Press & Events

## Suntech becomes part of the group Verint Systems, a a global leader in intelligence solutions

We are pleased to inform that Suntech was acquired by the group Verint ® Systems Inc in August 2011.

Through this acquisition, we are combining our leadership in the Latin American market for lawful interception and data retention with Verint's global expertise.

Now you can access the most comprehensive portfolio of the market, with excellence in services and the security of interacting with a partner whose track record is evidenced on a global scale.

**About Verint ® Systems Inc. (NASDAQ: VRNT):** Verint is a leading provider of intelligence solutions for workforce optimization and security. Verint solutions are currently used by more than 10,000 organizations in over 150 countries, including more than 85% of the companies on Fortune 100's ranking.





**WORK WITH US**
BECAME PART OF OUR TEAM

**Help us improve our site**

Help us identify broken links and improve our site. Please contact us and report an error!

**Interact with us**

Follow @suntechsociety on Twitter
Connect with us on Facebook
Join our community on LinkedIn
Work on Suntech

**Site Links**

Solutions
Clients
Associations
Partnerships
Press & Events
About us
Contacts

**Suntech Society**

Login
Lost Password
Register

**Newsletter**

Newsletter Subscription

**Contact**

**Brazil**

Florianópolis - Corporate Headquarters
brazil.office@suntechintelligence.com
+55 48 3322.0107

**CALA**

Buenos Aires
cala.office@suntechintelligence.com

Copyright 2012 Suntech - A Verint Company. All rights reserved.        Terms & Conditions        Privacy        Design Four Players

# EXHIBIT E

Case 1:15-cv-02457-GLW Document 1-5 Filed 03/31/15 Page 40 of 51

10-Q 1 a11-21273_110q.htm 10-Q

Table of Contents

---

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

# FORM 10-Q

(Mark One)

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended July 31, 2011**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____ .

Commission File No. 001-34807

# Verint Systems Inc.
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 11-3200514 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

| 330 South Service Road, Melville, New York | 11747 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

(631) 962-9600
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated Filer ☐          Accelerated Filer ☑          Non-Accelerated Filer ☐          Smaller Reporting Company ☐

3/22/2015                    www.sec.gov/Archives/edgar/data/1166388/000110465911050711/a11-21273_110q.htm#NotesToCondensedConsolidatedFinan_115412

Case 1:13-cv-02454-RW Document 11-12 Filed 03/31/15 Page 41 of 51

| | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|
| Stock-based compensation | 6,641 | | 8,035 | | 14,191 | | 26,005 |
| Other unallocated expenses | 35,005 | | 34,796 | | 70,217 | | 83,718 |
| | 49,746 | | 50,389 | | 100,704 | | 124,853 |
| **Operating income** | 21,410 | | 23,799 | | 40,244 | | 19,817 |
| Other expense, net | (6,973) | | (8,267) | | (22,743) | | (17,830) |
| **Income before provision for income taxes** | $ 14,437 | $ | 15,532 | $ | 17,501 | $ | 1,987 |

For the three and six months ended July 31, 2011, Video Intelligence segment revenue includes $0.7 million and $1.0 million of additional revenue, respectively, related to deferred revenue which is not recognizable in our GAAP revenue under accounting standards for business combinations. We include this additional revenue within our segment revenue because it better reflects our ongoing maintenance and service revenue stream.

## 16. SUBSEQUENT EVENTS

### Business Combinations

On August 4, 2011, we acquired all of the outstanding shares of Vovici Corporation ("Vovici"), a privately held provider of online survey management and enterprise feedback solutions. This acquisition enhances our Workforce Optimization product suite to include comprehensive Voice of the Customer ("VoC") software and services offerings, designed to help organizations implement a single-vendor solution set for collecting, analyzing and acting on customer insights.

34

Table of Contents

We acquired Vovici for approximately $56.3 million in cash at closing, including $0.4 million to repay Vovici's bank debt. In addition, the purchase consideration also included the exchange of certain unvested Vovici stock options for Verint stock options. We also agreed to make potential additional cash payments of up to approximately $19.1 million, contingent upon the achievement of certain performance targets over the period ending January 31, 2013. The initial purchase price allocation for this acquisition is not yet available, as we have not yet completed the appraisals necessary to assess the fair values of the tangible and identified intangible assets acquired and liabilities assumed, the assets and liabilities arising from contingencies (if any), and the amount of goodwill to be recognized as of the acquisition date. The fair values of the exchanged stock options, and the portion of those fair values (if any), to be included in the purchase price, are also not yet available. A preliminary purchase price allocation and unaudited pro forma condensed combined financial information for this business combination are expected to be included in our condensed consolidated financial statements for the three months ended October 31, 2011.

On August 2, 2011, we acquired all of the outstanding shares of a privately held provider of communications intelligence solutions, data retention services and network performance management, based in the Americas region. This acquisition expands our Communications Intelligence product portfolio and increases our presence in this region.

We acquired this company for approximately $10.9 million in cash at closing. We also agreed to make potential additional cash payments of up to approximately $23.0 million, contingent upon the achievement of certain performance targets over the period ending January 31, 2014. The initial purchase price allocation for this acquisition is not yet available, as we have not yet completed the appraisals necessary to assess the fair values of the tangible and identified intangible assets acquired and liabilities assumed, the assets and liabilities arising from contingencies (if any), and the amount of goodwill to be recognized as of the acquisition date. A preliminary purchase price allocation and unaudited pro forma condensed combined financial information for this business combination are expected to be included in our condensed consolidated financial statements for the three months ended October 31, 2011.

35

Table of Contents

# EXHIBIT F

10-K 1 a12-2869_110k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended January 31, 2012**

**Commission File Number 001-34807**

# VERINT SYSTEMS INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **11-3200514** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **330 South Service Road, Melville, New York** | **11747** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(631) 962-9600**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.001 par value per share | The NASDAQ Stock Market, LLC |

Securities registered pursuant to Section 12(g) of the Act:

**None**
Title of class

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒                              Accelerated filer ☐

3/22/2015    www.sec.gov/Archives/edgar/data/1166388/000110465912023217/a12-2869_110k.htm#a1_SummaryOfSignificantAccounting_092255

Case 1:15-cv-02457-CHW   Document 1   Filed 03/31/15   Page 44 of 51

| | | | |
|---|---:|---:|---:|
| Change in restricted cash and bank time deposits | 479 | (8,502) | 2,591 |
| **Net cash used in investing activities** | **(126,848)** | **(77,833)** | **(24,599)** |
| | | | |
| **Cash flows from financing activities:** | | | |
| Proceeds from borrowings, net of original issuance discount | 597,136 | — | — |
| Repayments of borrowings and other financing obligations | (587,549) | (38,163) | (6,088) |
| Proceeds from exercises of stock options | 12,474 | 40,787 | — |
| Payment of debt issuance and other debt-related costs | (15,276) | (4,039) | (152) |
| Dividends paid to noncontrolling interest | (1,930) | (2,191) | (4,145) |
| Purchases of treasury stock | (1,655) | (4,146) | — |
| Excess tax benefits from stock award plans | 847 | 815 | — |
| Other financing activities | (1,969) | — | (106) |
| **Net cash provided by (used in) financing activities** | **2,078** | **(6,937)** | **(10,491)** |
| Effect of exchange rate changes on cash and cash equivalents | (972) | (179) | 2,660 |
| **Net increase (decrease) in cash and cash equivalents** | **(19,244)** | **(14,429)** | **68,407** |
| **Cash and cash equivalents, beginning of year** | **169,906** | **184,335** | **115,928** |
| **Cash and cash equivalents, end of year** | **$ 150,662** | **$ 169,906** | **$ 184,335** |

See notes to consolidated financial statements.

F-6

€Table of Contents

# VERINT SYSTEMS INC. AND SUBSIDIARIES

## Notes to Consolidated Financial Statements

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

Unless the context otherwise requires, the terms "Verint", "we", "us", and "our" in these notes to consolidated financial statements refer to Verint® Systems Inc. and its consolidated subsidiaries.

Verint is a global leader in Actionable Intelligence® solutions and value-added services. Our solutions enable organizations of all sizes to make more timely and effective decisions to improve enterprise performance and make the world a safer place. Our solutions are used to capture, distill, and analyze complex and underused information sources, such as voice, video, and unstructured text. In the enterprise intelligence market, our workforce optimization and voice of the customer solutions help organizations enhance customer service operations in contact centers, branches, and back-office environments to increase customer satisfaction, reduce operating costs, identify revenue opportunities, and improve profitability. In the security intelligence market, our communications and cyber intelligence, video and situation intelligence, and public safety solutions help government and commercial organizations in their efforts to protect people and property and neutralize terrorism and crime.

### Significant Ownership

Comverse Technology, Inc. ("Comverse"), beneficially owns a majority of our common stock (assuming the conversion of Comverse's preferred stock holdings into common stock) and holds a majority of the voting power of our common stock. During the three years ended January 31, 2012, Comverse did not provide us with material levels of corporate or administrative services.

### Basis of Presentation

The accompanying consolidated financial statements include the accounts of Verint Systems Inc., our wholly owned subsidiaries, and a joint venture in which we hold a 50% equity interest. This joint venture functions as a systems integrator for Asian markets and is a variable interest entity in which we are the primary beneficiary and is therefore included within our consolidated financial statements. Investments in companies in which we have less than a 20% ownership interest and do not exercise significant influence are accounted for at cost. We have included the results of operations of acquired companies from the date of acquisition.

Case 1:15-cv-02457-CHW Document 1 Filed 03/31/15 Page 45 of 51

All significant intercompany transactions and balances have been eliminated.

F-7

Table of Contents

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires our management to make estimates and assumptions, which may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Cash and Cash Equivalents

Cash primarily consists of cash on hand and bank deposits. Cash equivalents primarily consist of interest-bearing money market accounts and other highly liquid investments with an original maturity of three months or less when purchased.

### Restricted Cash and Bank Time Deposits

Restricted cash and restricted bank time deposits are pledged as collateral or otherwise restricted as to use for vendor payables, general liability insurance, workers' compensation insurance, warranty programs, and other obligations. Restricted bank time deposits generally consist of certificates of deposit with original maturities of between 30 and 360 days.

### Investments

As of January 31, 2012 and 2011, all of our excess funds are cash, cash equivalents, restricted cash, or restricted time deposits. Historically, investments generally consist of marketable debt securities of corporations, the U.S. government, and agencies of the U.S. government. We do not invest in auction rate securities as a matter of policy.

Our investments in marketable securities are classified as available-for-sale, and are stated at fair value based on market quotes. Investments with stated maturities beyond one year are classified as short-term if the securities are highly marketable and readily convertible into cash for current operations. Unrealized gains and losses, net of deferred taxes, are recorded as a component of accumulated other comprehensive income (loss) in stockholders' equity (deficit). We recognize realized gains and losses upon sale of short-term investments and declines in value deemed to be other than temporary using the specific identification method. Interest on short-term investments is recognized within income when earned.

We periodically review our investments for indications of possible impairment in value. Factors considered in determining whether a loss is other than temporary include the length of time and extent to which fair value has been below the cost basis, the financial condition and near-term prospects of the investee, and our intent and ability to hold the investment for a period of time sufficient to allow for any anticipated recovery in market value. Upon sale, the cumulative unrealized gain or loss associated with the sold security that was previously recorded in accumulated other comprehensive income (loss) is reclassified into the consolidated statement of operations as a realized gain (loss), which is included in other income (expense), net.

F-8

Table of Contents

### Concentrations of Credit Risk

Financial instruments that potentially subject us to concentrations of credit risk consist principally of cash and cash equivalents, bank time deposits, short-term investments, and trade accounts receivable. We invest our cash in bank accounts, certificates of deposit, and money market accounts with major financial institutions, in U.S. Treasury and agency obligations, and in debt securities of corporations. By policy, we seek to limit credit exposure on investments through diversification and by restricting our investments to highly rated securities.

We grant credit terms to our customers in the ordinary course of business. Concentrations of credit risk with respect to trade

EX-21.1 5 a12-2869_1ex21d1.htm EX-21.1

**EXHIBIT 21.1**

### Subsidiaries of Verint Systems Inc.
(as of January 31, 2012)

| Name | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Blue Pumpkin Software Israel Ltd. | Israel |
| CIS Comverse Information Systems Ltd. | Israel |
| Febrouin Investments Ltd. | Cyprus |
| Focal Info Bulgaria EOOD | Bulgaria |
| Focal Info Israel Ltd. | Israel |
| Global Management Technologies, LLC | Delaware |
| Global Management Technologies Asia-Pacific PTY Limited | Australia |
| Global Management Technologies Europe Limited | United Kingdom |
| Iontas, Inc. | Delaware |
| Iontas Limited | Ireland |
| Jacou Participações Ltda. | Brazil |
| MultiVision Holdings Limited | British Virgin Islands |
| Rontal Engineering Applications (2001) Ltd. | Israel |
| Rontal-USA Inc. | Delaware |
| Suntech S.A. | Brazil |
| Suntech Participações Ltda. | Brazil |
| Syborg GmbH | Germany |
| Syborg Grundbesitz GmbH | Germany |
| Syborg Informationsysteme b.h. OHG | Germany |
| Verint Americas Inc. | Delaware |
| Verint Blue Pumpkin Software GmbH | Germany |
| Verint Blue Pumpkin Software LLC | Delaware |
| Verint Systems (Asia Pacific) Limited | Hong Kong |
| Verint Systems (Australia) PTY Ltd. | Australia |
| Verint Systems (India) Private Ltd. | India |
| Verint Systems Japan K.K. | Japan |
| Verint Systems (Macau) Limited | Macau |
| Verint Systems (Singapore) Pte. Ltd. (1) | Singapore |
| Verint Systems (Zhuhai) Limited | People's Republic of China |
| Verint Systems B.V. | The Netherlands |
| Verint Systems Canada Inc. | Canada |
| Verint Systems Cayman Limited | Cayman Islands |
| Verint Systems GmbH | Germany |
| Verint Systems Ltd. | Israel |
| Verint Systems Poland sp.z.o.o. | Poland |
| Verint Systems SAS | France |
| Verint Systems UK Ltd. | United Kingdom |
| Verint Technology Inc. | Delaware |
| Verint Technology UK Limited | United Kingdom |
| Verint Video Solutions AB | Sweden |
| Verint Video Solutions Inc. | Nevada |
| Verint Video Solutions SL | Spain |
| Verint Video Solutions UK Limited | United Kingdom |

| | |
|---|---|
| Verint Witness Systems Canada Inc. | Canada |
| Verint Witness Systems Deutschland GmbH | Germany |
| Verint Witness Systems | United Kingdom |
| Verint Witness Systems LLC | Delaware |
| Verint Witness Systems S.A. de CV | Mexico |
| Verint Witness Systems Services S.A. de CV | Mexico |
| Verint Witness Systems Software, Hardware, E Servicos Do Brasil Ltda | Brazil |
| Verint WS Holdings Ltd. | United Kingdom |
| View Links Euclipse Ltd. | Israel |
| Vovici LLC | Delaware |
| Witness Systems Software (India) Private Limited | India |

---

(1) We own a 50% equity interest in this entity and do not have the power to unilaterally direct or cause the direction of the management and policies of this entity.

Table of Contents

## VERINT SYSTEMS INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

### 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### Description of Business

Unless the context otherwise requires, the terms "Verint", "we", "us", and "our" in these notes to consolidated financial statements refer to Verint Systems Inc. and its consolidated subsidiaries.

Verint is a global leader in Actionable Intelligence solutions. Actionable Intelligence is a necessity in a dynamic world of massive information growth because it empowers organizations with crucial insights and enables decision makers to anticipate, respond, and take action. With Verint solutions and value-added services, organizations of all sizes and across many industries can make more timely and effective decisions. Today, more than 10,000 organizations in over 180 countries, including over 80 percent of the Fortune 100, use Verint solutions to improve enterprise performance and make the world a safer place.

#### Significant Change in Ownership

For the periods presented in these consolidated financial statements through and including January 31, 2013, Comverse Technology, Inc. ("CTI"), beneficially owned a majority of our common stock (assuming the conversion of CTI's preferred stock holdings into common stock) and held a majority of the voting power of our common stock. On February 4, 2013, CTI was merged with and into our new, wholly owned subsidiary, eliminating CTI's majority ownership and control of us. Further details are provided in Note 4, "Merger with CTI".

During the years ended January 31, 2013 and 2012, CTI did not provide us with material levels of corporate or administrative services.

#### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Verint Systems Inc., our wholly owned subsidiaries, and a joint venture in which we hold a 50% equity interest. This joint venture functions as a systems integrator for Asian markets and is a variable interest entity in which we are the primary beneficiary. Investments in companies in which we have less than a 20% ownership interest and do not exercise significant influence are accounted for at cost. We include the results of operations of acquired companies from the date of acquisition. All significant intercompany transactions and balances are eliminated.

#### Use of Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires our management to make estimates and assumptions, which may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

#### Cash and Cash Equivalents

Cash primarily consists of cash on hand and bank deposits. Cash equivalents primarily consist of interest-bearing money market accounts and other highly liquid investments with remaining maturities of three months or less when purchased.

#### Restricted Cash and Bank Time Deposits

Restricted cash and restricted bank time deposits are pledged as collateral or otherwise restricted as to use for vendor payables, general liability insurance, workers' compensation insurance, warranty programs, and other obligations. Restricted bank time deposits generally consist of certificates of deposit with original maturities of between 30 and 360 days.

Case 1:15-cv-02457-GHW    Document 1    Filed 03/31/15    Page 49 of 51

EX-21.1 4 vrnt-ex211_20140131xform10.htm EXHIBIT 21.1

**EXHIBIT 21.1**

### Subsidiaries of Verint Systems Inc.
(as of January 31, 2014)

| Name | Jurisdiction of Incorporation or Organization |
|---|---|
| Blue Pumpkin Software Israel Ltd. | Israel |
| CIS Comverse Information Systems Ltd. | Israel |
| Febrouin Investments Ltd. | Cyprus |
| Focal Info Israel Ltd. | Israel |
| Global Management Technologies, LLC | Delaware |
| Global Management Technologies Asia-Pacific PTY Limited | Australia |
| Global Management Technologies Europe Limited | United Kingdom |
| Iontas, Inc. | Delaware |
| Iontas Limited | Ireland |
| MultiVision Holdings Limited | British Virgin Islands |
| Rontal Engineering Applications (2001) Ltd. | Israel |
| Rontal-USA Inc. | Delaware |
| Suntech S.A. | Brazil |
| Syborg GmbH | Germany |
| Syborg Grundbesitz GmbH | Germany |
| Syborg Informationsysteme b.h. OHG | Germany |
| Verint Americas Inc. | Delaware |
| Verint Blue Pumpkin Software LLC | Delaware |
| Verint Systems (Asia Pacific) Limited | Hong Kong |
| Verint Systems (Australia) PTY Ltd. | Australia |
| Verint Systems (India) Private Ltd. | India |
| Verint Systems (Singapore) Pte. Ltd. (1) | Singapore |
| Verint Systems (Zhuhai) Limited | People's Republic of China |
| Verint Systems B.V. | The Netherlands |
| Verint Systems Bulgaria | Bulgaria |
| Verint Systems Canada Inc. | Canada |
| Verint Systems Cayman Limited | Cayman Islands |
| Verint Systems GmbH | Germany |
| Verint Systems Japan K.K. | Japan |
| Verint Systems Ltd. | Israel |
| Verint Systems New Zealand Limited | New Zealand |
| Verint Systems Poland sp.z.o.o. | Poland |
| Verint Systems SAS | France |
| Verint Systems UK Ltd. | United Kingdom |
| Verint Technology Inc. | Delaware |
| Verint Technology UK Limited | United Kingdom |

| | |
|---|---|
| Verint Video Solutions Inc. | Nevada |
| Verint Video Solutions SL | Spain |
| Verint Video Solutions UK Limited | United Kingdom |
| Verint Witness Systems Deutschland GmbH | Germany |
| Verint Witness Systems | United Kingdom |
| Verint Witness Systems LLC | Delaware |
| Verint Witness Systems S.A. de C.V. | Mexico |

| | |
|---|---|
| Verint Witness Systems Services S.A. de C.V. | Mexico |
| Verint Witness Systems Software, Hardware, E Servicos Do Brasil Ltda | Brazil |
| Verint WS Holdings Ltd. | United Kingdom |
| View Links Euclipse Ltd. | Israel |
| Victory Acquisition I LLC | Delaware |
| Vovici LLC | Delaware |
| Witness Systems Software (India) Private Limited | India |

(1)   We own a 50% equity interest in this entity and do not have the power to unilaterally direct or cause the direction of the management and policies of this entity.