UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/27/2016
```

------------------------------------------------------------X
                  :

INTERNATIONAL TECHNOLOGIES    :
MARKETING, INC.,               :

               Plaintiff,  :

                  :

          -v -           :

                  :

VERINT SYSTEMS, LTD.,        :

                  :

             Defendant.  :

                  :
------------------------------------------------------------ X

1:15-cv-2457-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, District Judge:

## I.    INTRODUCTION

In late 2006, plaintiff International Technologies Marketing, Inc. ("ITM") agreed to assist defendant Verint Systems, Ltd. ("Verint") in its efforts to acquire a Brazilian company, Suntech. ITM had initially identified Suntech as a potential customer for Verint's telecommunications products, but Verint quickly shifted its focus towards an acquisition instead.  According to the terms of the contract entered into between ITM and Verint, ITM was to use best commercial efforts to assist Verint in acquiring Suntech, but was only to be compensated if Verint completed the purchase.  The contract expired in February 2007, but ITM maintained its role facilitating negotiations between the two sides through September of that same year.  Although Verint and Suntech got close to reaching a deal at various points in time, a deal was not reached, and—as far as ITM was aware—any potential acquisition was off.

Nearly four years later, Verint acquired Suntech.  ITM now brings suit, alleging that Verint breached the parties' contract because it eventually acquired Suntech without compensating ITM. ITM also brings additional state law claims based on similar allegations.  Because the complaint fails

to plausibly allege that Verint had any obligation to pay ITM for an acquisition that occurred nearly four years after the parties' contract expired, and for the further reasons outlined below, defendant's motion to dismiss is GRANTED.

## II.   BACKGROUND[1]

ITM is a small company founded in February 2004 that provides consulting and business development services.  Am. Compl. ¶¶ 1, 16.  ITM bills itself as a having an expertise in security products and technology used by law enforcement and intelligence agencies, with a particular knowledge of the Brazilian market.  *Id.* ¶ 15.  ITM's business involved brokering relationships between large foreign companies in the security/technology sector with existing Brazilian companies, thereby allowing the foreign companies to overcome local barriers that would otherwise hinder their entry into the Brazilian market.  *Id.* ¶¶ 16–17.

In the summer of 2004, ITM identified Verint, an Israeli vendor that sells telecommunications monitoring systems to law enforcement agencies, as a potential business partner for breaking into the Brazilian market.  *Id.* ¶¶ 2, 17.  Verint was not unaware of the potential for selling its products in Brazil—it had previously sold its equipment to the Brazilian federal police— but its local reputation had been damaged when that equipment failed to conform to local standards. *Id.* ¶¶ 19, 24–25.  Despite that setback, Verint expressed an interest in continuing to sell its product in Brazil.  After further talks, Verint agreed to allow ITM to develop cooperation programs with local Brazilian companies who would be willing to customize and resell Verint's products in Brazil. *Id.* ¶¶ 18–21.

---

[1] Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of this Rule 12(b)(6) motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The first Brazilian company that ITM approached on behalf of Verint was Digitro, a Brazilian company that sold telecommunications equipment to the Brazilian federal police. *Id.* ¶ 22. In order to memorialize the parties' obligations regarding that undertaking, ITM and Verint entered into a written agreement on February 22, 2006 (the "Initial Agreement"). *Id.*; Initial Agreement, Dkt. No. 41-2.  Under the terms of the contract, ITM agreed to make an introduction and recommend Verint to Digitro, as well as to assist in negotiations between the two companies.  Initial Agreement § 1.2.  In return, ITM was entitled to a 5% commission from Verint's sales to Digitro, for the duration of the Initial Agreement plus six months. *Id.* Appendix A § 1.  The scope of ITM's payments was expressly limited to the 5% commission, referred to as a "finder's fee" in the contract. Specifically, the Initial Agreement provided that ITM would "[b]ear all the expenses incurred by it in the performance of [its] obligations . . . and work at its own risk." *Id.* § 2.1.  Moreover, the agreement stated that, aside from the finder's fee, "[n]o other payment or reimbursement will be due or payable to [ITM]," and "[i]n no event will [Verint] be liable to [ITM] for any business expenses, loss of profits, or incidental, indirect or consequential damages." *Id.* § 7.  The Initial Agreement expressly expired after twelve months,[2] and thus was effective until February 21, 2007. *Id.* § 8.

Later that same year, ITM also identified Suntech as another potential prospect for Verint to develop a business relationship.  Am. Compl. ¶¶ 27–30.  Suntech, like Digitro, is a Brazilian company in the telecommunications security field. *Id.* ¶ 27.  In order to extend the Initial Agreement to cover sales to Suntech, the parties executed a short, one-page amendment to the agreement on September 11, 2006 (the "September Amendment"). *Id.* ¶ 31; September Amendment, Dkt. No. 41-3.  The amendment was limited in scope, and only modified "certain terms of the [Initial Agreement]."  September Amendment.  Specifically, ITM agreed to assist Verint

---

[2] The Initial Agreement states that it was to be "effective from the date hereof and shall continue in effect for a period of 12 months thereafter." *Id.* § 8

in establishing a business relationship with Suntech, in return for a 5% commission from Verint's sales to Suntech. *Id.* § 2. Aside from that new provision, the September Amendment provided that "all terms and conditions of the [Initial Agreement] will continue to apply to the parties." *Id.* § 3.

Shortly after executing the September Amendment, Verint became interested in potentially acquiring Suntech outright, rather than simply selling products to it. *Id.* ¶¶ 32–33, 36, 38. ITM agreed to assist Verint in the contemplated acquisition, and both parties agreed that a new written agreement was needed to cover ITM's expanded responsibilities, although one was not signed for several months. *Id.* ¶¶ 32–34, 44. Nevertheless, ITM began gathering information and meeting with Suntech, with the goal of facilitating an acquisition. *Id.* ¶ 34. Over the course of the next few months, ITM expended considerable effort towards this goal, which included setting up meetings between the parties, persuading Suntech to accept an acquisition, and facilitating negotiations and attempting to "close the gap" between the parties' respective positions. *Id.* ¶¶ 33, 36–39, 46, 70. These efforts seemed to culminate in December 2006, when Verint executives presented Suntech with a letter of intent and term sheet for the proposed acquisition. ¶¶ 40–41.

As a deal appeared close to fruition, Verint and ITM again agreed to amend their existing agreement to cover the contemplated acquisition, which the parties executed on December 20, 2006 (the "December Amendment"). *Id.* ¶ 44; December Amendment, Dkt. No. 41-4. As with the September Amendment, the December Amendment was a short one-page amendment that only modified "certain terms" of the prior agreements. December Amendment. The agreement required ITM to use its "best commercial efforts to assist and support [Verint] in its activities regarding the purchase (shares or assets) of Suntech[.]" December Amendment § 2. In return, the agreement provided that "[i]n the event that [Verint] complete the Purchase of Suntech, [ITM] shall be entitled" to 4% of Verint's payment to Suntech at the purchase closing, and 3% of any payments

subsequent to closing.[3]  *Id.*  This compensation was to be "in lieu of any other compensation otherwise set forth" in the prior agreements.  *Id.*  Aside from these added provisions, the December Amendment expressly provided that "[e]xcept as specifically included herein, all terms and conditions of the [Initial Agreement] will continue to apply between the parties."  *Id.* § 3.

Negotiations between Verint and Suntech continued into 2007.  After several exchanges of proposals and counter proposals, the parties reached agreement on essentially all major terms in January 2007.  Am. Compl. ¶¶ 45–47.  However, a term sheet was not signed at that time.  *Id.* ¶ 48.  Unbeknownst to ITM, Verint began focusing its efforts on acquiring an unrelated company outside of Brazil, Witness Systems, which was much larger in size than Suntech.  *Id.*  On February 4, 2007, Verint announced the acquisition of Witness Systems, and shortly thereafter informed ITM that the Suntech acquisition was "off."  *Id.* ¶¶ 48–50.

Over the next several months, Verint and Suntech discussed the possibility of resuming their negotiations, notwithstanding the earlier representation that the acquisition was "off."  *Id.* ¶¶ 54–55.  ITM was not involved in these initial discussions, but was later informed by Suntech of Verint's renewed interest.  *Id.* ¶ 56.  ITM then again resumed its role facilitating negotiations between the parties, which continued through the summer of 2007.  *Id.* ¶¶ 56–63.  During that time, ITM played a critical role in keeping the negotiations alive.  *Id.* ¶ 60.  But despite the renewed discussions and assurances that it was negotiating in good faith, Verint continued to hesitate over the acquisition.  *Id.* ¶¶ 62–64.  In early September 2007, Verint indicated that "the sides were not close to a deal."  *Id.* ¶ 66.  Finally, on September 10, 2007, Verint "represented concretely that the Suntech acquisition was off."  *Id.*  ITM maintained periodic contact with Verint after that time, but was never involved

---

[3] Specifically, the December Amendment provides for the following compensation:  "(i) With regard to the payment that may be made by [Verint] to Suntech at the Purchase Closing, [Verint] shall pay [ITM] 4% of the [sic] such payment[;] (ii) With regard to any payment for the Purchase made subsequent to the Closing, [Verint] shall pay [ITM] 3% of any such subsequent payment[.]"  December Amendment § 2.

in any further negotiations between Verint and Suntech, and as far as it was aware, the deal was effectively off. *Id.* ¶¶ 66–69. Thus, despite spending approximately $350,000 in trying to broker an agreement, no deal was consummated, and Verint did not receive any payments for its efforts. *Id.* ¶ 76.

In August 2011—nearly four years later—Verint acquired Suntech. *Id.* ¶ 71. Under the terms of that acquisition, Verint paid Suntech $10.9 million at closing and $23 million in post-closing payments. *Id.* Upon discovering that Verint acquired Suntech, and perhaps recalling its previous efforts several years before, ITM demanded payment in accordance with the terms of the December Amendment. *Id.* ¶ 74. Verint refused, and ITM filed the present suit on March 31, 2015. The complaint alleged several state law claims, and was brought in federal court based on diversity of citizenship under 28 U.S.C. § 1332.

Defendant filed a motion to dismiss the complaint on June 25, 2015. The Court gave plaintiff the opportunity to amend its complaint in response to the filing, and plaintiff filed an amended complaint on July 17, 2015. The amended complaint brings four state law claims for breach of contract, breach of implied contract, breach of the implied covenant of good faith and fair dealing, and a claim for unjust enrichment and quantum meruit. Defendant filed a motion to dismiss the amended complaint on August 7, 2015, which was fully briefed as of September 4, 2015.

## III.   ANALYSIS

### A.  Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege sufficient facts, when accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). While a complaint need not present "detailed factual allegations," *Twombly,* 550 U.S. at 555, legal conclusions, unsupported by factual assertions, are insufficient. *Iqbal,* 556 U.S. at 679. In

considering a motion to dismiss, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Here, plaintiff attached copies of the relevant contracts as exhibits to its amended complaint, which the Court considers in resolving the motion.

### B.  Breach of Express Contract

Plaintiff's first cause of action is for breach of contract, based on defendant's failure to pay the compensation specified in the December Amendment after acquiring Suntech in 2011.  The Initial Agreement expressly provided that the contract "shall be interpreted in accordance with, and governed in all respects by, the laws of New York."  Initial Agreement § 9.1.  Thus, the parties agree that New York state law governs the parties' dispute.  "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir. 1994) (footnote omitted).  "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.,* 780 N.E.2d 166, 170 (N.Y. 2002).  Thus, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (quoting *Slamow v. Del Col,* 594 N.E.2d 918, 919 (N.Y. 1992)).

Although the Initial Agreement expired by its terms on February 21, 2007, and the December Amendment expressly provided that "all terms and conditions" of the Initial Agreement applied, plaintiff argues that, for a number of reasons, the December Amendment should not be

interpreted to incorporate the February 21, 2007 expiration date.  The Court addresses each of those arguments in turn.

### 1.  *Finder vs Broker*

As a preliminary matter, the Court examines whether the terms of the December Amendment required plaintiff to act as a finder or a broker.  "[A] finder is not a broker, although they perform some related functions."  *Northeast Gen. Corp. v. Wellington Advert., Inc.*, 624 N.E.2d 129, 131 (N.Y. 1993).  Although the contract labelled plaintiff as a "finder," whether a party acts as a finder or a broker is not determined "by the nomenclature 'finder' or 'broker.'"  *See id.*  Rather, the Court must examine "the services agreed to under the contract between the parties," and evaluate "the quality and quantity of services rendered."  *Id.*  The Court may determine as a matter of law whether the terms of an agreement require a party to act as a finder or as a broker.  *See id.* (holding that contract required plaintiff to act only as finder).

A finder's job is "to introduce and bring the parties together, without any obligation or power to negotiate the transaction, in order to earn the finder's fee."  *Id.*  A broker, by comparison, also introduces parties but then "must ordinarily also bring the parties to an agreement."  *Id.*  "[A] finder has far less involvement in the ultimate transaction quantitatively and qualitatively, and thus has significantly fewer and different responsibilities to the hiring client.  Often, for example, the finder may accomplish work in as little as two phone calls."  *Id.* at 131–32 (internal citation omitted).  Thus, a finder may fulfill its job simply by introducing parties to one another, while a broker must take additional steps to bring the parties to an agreement.

The December Amendment called for plaintiff to act as a broker.  The contract did not require plaintiff to simply introduce the parties, but rather required plaintiff to use best commercial efforts to "assist and support" Verint's activities regarding the Suntech purchase, and to actually bring the parties to an agreement.  Neither party squarely addressed the issue, and used the terms

somewhat interchangeably in their briefing.  Nevertheless, the Court's conclusion is not contradicted by the allegations of the complaint, which describe in great detail plaintiff's efforts in serving as an intermediary and providing an integral role in negotiations.  Accordingly, the Court finds that the contract required plaintiff to act as a broker.

### 2. *Ambiguity*

Plaintiff first argues that the contract is ambiguous as to whether the December Amendment incorporated the February 21, 2007 expiration date from Initial Agreement.  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) (citing *Van Wagner Advert. Corp. v. S & M Enterprises*, 492 N.E.2d 756, 758 (N.Y. 1986)).  Extrinsic evidence of the parties' intent may only be considered where an agreement is ambiguous, and "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."  *W.W.W. Associates*, 566 N.E.2d at 642 (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 580 (N.Y. 1969)).  "[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007)).  Conversely, "the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  *Id.* (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir. 2000).  "When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms."  *Id.* (citing *South Rd. Assocs., LLC v. IBM*, 826 N.E. 2d 806, 809 (N.Y. 2005)).

In resolving whether an ambiguity exists, the Court must determine whether a clause is ambiguous "when read in the context of the entire agreement."  *Law Debenture Trust Co. of New York*

9

*v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993))).  "If the document as a whole "makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement."  *Lockheed Martin*, 639 F.3d at 69 (brackets and internal quotation marks omitted) (quoting *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998)).

Although the December Amendment expressly provides that "all terms and conditions" of the Initial Agreement applied, and the expiration provision is a term of the Initial Agreement, plaintiff nevertheless contends that the contract is ambiguous.  Plaintiff does not offer a contrary reading of this language, other than to cast general doubt as to whether the parties actually intended *all* terms of the prior agreement to apply.  The Court disagrees, and finds that the contract is unambiguous on its face.

The terms of the December Amendment are clear —"[e]xcept as specifically included [in the December Amendment], *all* terms and conditions of the [Initial] Agreement" applied.  December Amendment § 3 (emphasis added).  Moreover, when read in the context of the entire agreement, it is clear that the parties intended to incorporate all terms from the Initial Agreement.  The December Amendment begins by noting the existence of the Initial Agreement and September Amendment, then specifies that the parties wished to amend only "certain terms" of the prior agreements.  December Amendment.  The December Amendment then continues by stating that "the Parties hereby agree to *add*" provisions covering the Suntech acquisition to the Initial Agreement—not to override or ignore those prior provisions.  *See id.* § 2 (emphasis added).  To resolve all doubt, the contract then expressly states that all prior terms and conditions from the Initial Agreement continued to apply.  Therefore, according to the plain terms of the parties' agreement, the February 21, 2007 expiration date must be construed to apply to the December Amendment.

10

Plaintiff offers no other plausible reading of the contract. Indeed, Plaintiff's proposed interpretation would simply change the requirement that "all terms and conditions" of the Initial Agreement applied, to instead read that only "*some* terms" applied. But "[c]ourts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (quoting *Reiss v. Financial Performance Corp.,* 764 N.E.2d 958, 961 (N.Y. 2001)). Thus, "all terms," including the February 21, 2007 expiration date, applied.

Plaintiff also argues that conditional language in the December Amendment, regarding the timing of plaintiff's compensation, demonstrates ambiguity as to whether the parties intended the expiration to apply. Specifically, plaintiff points to the provision stating that "[i]n the event that [Verint] completes the Purchase of Suntech, [ITM] shall be entitled to" payment. December Amendment § 2. This conditional language, plaintiff contends, indicates that the contract can be read to effectively contain no expiration—"in the event" that Verint purchased Suntech, whether that be four months or four years later, plaintiff argues that the contract required that it be compensated. The Court disagrees.

Plaintiff's reading is not plausible for several reasons. First, such an interpretation would render limitless defendant's conditional obligation to make payment. But the contract contained an express limit—its expiration. Generally, "[w]hen a contract is terminated, such as by expiration of its own terms, the rights and obligations thereunder cease." *Twitchell v. Town of Pittsford*, 483 N.Y.S.2d 524, 525 (App. Div. 1984) *aff'd*, 489 N.E.2d 250 (N.Y. 1985). Thus, defendant's conditional obligation to pay plaintiff if it completed the purchase ceased when, without it having acquired Suntech, the contract expired.

Indeed, in order to be entitled to a commission, it is well-established that "a broker must show that he brought the parties together at mutually acceptable terms *within* the period of his employment." *Bashant v. Spinella*, 415 N.Y.S.2d 146, 147 (App. Div. 1979) (citing *Bereswill v. Yablon*, 160 N.E.2d 531, 533 (N.Y. 1959)) (emphasis added); *accord Sibbald v. Bethlehem Iron Co.*, 83 N.Y. 378, 382 (1881) ("[T]he duty assumed by the broker is to bring the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until that is done his right to commissions does not accrue."). In the absence of fraud or bad faith, a "broker is not entitled to a commission on a sale negotiated after the term of his employment." *Bashant*, 415 N.Y.S.2d at 147 (citing *Douglas Real Estate Mgmt. Corp. v. Montgomery Ward & Co.*, 148 N.E.2d 903, 905 (N.Y. 1958)). The plain language of the Initial Agreement limited plaintiff's term of employment to February 21, 2007; without more, plaintiff has no plausible claim that defendant breached the contract by failing to pay a fee four years after the contract expired.

Moreover, as already noted, plaintiff's proffered interpretation limiting the expiration provision would distort the requirement that "all terms and conditions" from the Initial Agreement applied. Rather, the only plausible interpretation that gives "full meaning and effect to *all* of [the contract's] provisions," *see RAG Am. Coal Co. v. Cyprus Amax Minerals Co.*, 750 N.Y.S.2d 284, 285 (App. Div. 2002) (emphasis added), is that defendant's conditional obligation to make payment was limited to the term of the contract by the expiration provision.

Plaintiff also argues that several other terms and provisions in the contract render the December Amendment ambiguous. For example, plaintiff notes that the payment provision was triggered by the completion of the "Purchase of Suntech," which was defined as "the purchase (shares or assets) of Suntech." Plaintiff contends that what constitutes completion of the "purchase" is ambiguous, and thus whether the expiration provision applied may also not be determined as a matter of law. The Court does not appreciate the logic of this argument. Even if

12

the contract is ambiguous as to what constitutes completion of the Suntech purchase—notwithstanding that both parties agree that the acquisition was not completed until August 2011—that does not render an unrelated, unambiguous provision incorporating the terms and conditions of the Initial Agreement ambiguous.  As the Second Circuit has explained, "a contract that is ambiguous in one respect . . . need not be ambiguous in another . . . ."  *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001).[4]

Finally, plaintiff argues that the December Amendment radically changed the parties' obligations from the prior agreements, and thus should not be read to incorporate the prior expiration.  But no matter how plaintiff attempts to characterize the December Amendment after the fact, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."  *Greenfield*, 780 N.E.2d at 170.  By the express terms of the contract, all terms and limitations of the Initial Agreement, including the February 21, 2007 expiration date, applied.

### 3.  *Commercially Unreasonable*

Next, plaintiff contends that, for several reasons, incorporating the expiration provision from the Initial Agreement would result in a commercially unreasonable reading of the December Amendment.  For example, plaintiff notes that such a reading would effectively have required, in order for it to receive compensation, that defendant complete the Suntech acquisition within a sixty-day window.  Relying on conjecture and without citation to any authority, plaintiff asserts that completing a major acquisition in that timeframe is commercially unreasonable.  Although plaintiff also undercuts this point by alleging that a term sheet was ready to be signed several weeks before the parties executed the December Amendment, it nevertheless maintains that this unrealistic

---

[4] Similarly, plaintiff argues that the contract is silent as to when payment was due following the completion of the Suntech purchase, and thus is ambiguous for this additional reason.  However, "silence does not equate to contractual ambiguity."  *Greenfield*, 780 N.E. 2d at 173.  Moreover, for the reasons already stated, a purported ambiguity in one provision does not necessarily render an unrelated provision ambiguous.

timeframe demonstrates that the parties did not intend to incorporate all terms and conditions from the Initial Agreement. Defendant, on the other hand, notes that other, larger mergers have been concluded in much less time.

The Court need not discuss the issue at length, however, because the New York Court of Appeals has made clear that "an inquiry into commercial reasonableness is only warranted where a contract is ambiguous." *Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 985 N.E.2d 893, 897 (N.Y. 2013). Where an agreement is unambiguous, as it is here, "its reasonableness is beside the mark." *Id.* Although plaintiff may regret the terms that it plainly agreed to, "[a]bsent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *Koren-DiResta Const. Co. v. New York City Sch. Const. Auth.*, 740 N.Y.S.2d 56, 61 (App. Div. 2002) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978)).

Because the Court finds that the contract unambiguously expired on February 21, 2007, defendant's motion to dismiss plaintiff's claim for breach of contract is GRANTED. The dismissal is without leave to replead the claim based on the purported ambiguity of the contractual language, because any attempt to replead on this basis would be futile. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile).

### C. Breach of Implied-In-Fact Contract

Plaintiff next argues that even if the contract expired on February 21, 2007, the parties' conduct thereafter created an implied contract, which incorporated the terms of their prior agreement. Thus, plaintiff contends that defendant's failure to pay the compensation specified in the December Amendment breached the terms of an implied-in-fact contract that continued in effect—for over four years—through the date of the Suntech acquisition in August 2011.

14

Under New York law, an implied contract "may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct." *Jemzura v. Jemzura,* 330 N.E.2d 414, 420 (N.Y. 1975) (internal citation omitted). An implied contract "is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Id.*

Although the parties' express contract expired on February 21, 2007, plaintiff asserts that the parties conduct thereafter evidenced an intent to enter into a new and enforceable contract on the same terms as the expired December Amendment. Under New York law, "the parties' conduct after the expiration of [a] written contract, including [a party's] continued rendition of services, [the other party's] acceptance of those services and . . . payment . . . in accordance with the terms of the written contract" can "establish a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract . . . ." *Watts v. Columbia Artists Mgmt. Inc.*, 591 N.Y.S.2d 234, 236 (App. Div. 1992); *see also Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946) ("When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old.") (footnote omitted). Notwithstanding, "the fact that the parties continue to deal under some sort of informal arrangement does not, without more, mean that all the terms of the expired formal contract continue to apply." *Computerized Med. Imaging Equip., Inc. v. Diasonics Ultrasound, Inc.*, 758 N.Y.S.2d 228, 230 (App. Div. 2003) (brackets and internal quotation marks omitted) (quoting *Twitchell,* 483 N.Y.S.2d at 525). The existence of an implied contract "will ordinarily be a question of fact, as it involves an assessment of the parties' conduct and the extent to which such conduct demonstrates a meeting of the minds." *Monahan v. Lewis*, 858 N.Y.S.2d 812, 814 (App. Div. 2008).

Although plaintiff has adequately alleged the existence of an implied-in-fact contract based on the parties' conduct through September 2007, plaintiff fails to plausibly allege that such an agreement continued without expiration through August 2011.  The complaint is devoid of any facts plausibly suggesting that plaintiff continued its efforts to broker a deal under the terms of the agreement for a period of nearly four years.[5]  Given that the complaint concedes that defendant "represented *concretely* that the Suntech acquisition was off" in September 2007, Am. Compl. ¶ 66 (emphasis added), the absence of any such plausible allegations is not surprising.

In any event, each of the prior written contracts had an expiration provision of only one year or less.  Plaintiff concedes that the parties did not agree to any new or materially different contractual terms from those in their prior agreements—rather, plaintiff maintains that "the parties continued to perform seamlessly under the terms of the allegedly expiring contract," without discussion or variation in the course of their performance.  Pl.'s Opp'n at 23; *see also* Am. Compl. ¶¶ 54–67.  Accepting those allegations as true, plaintiff fails to allege the basis for an implied contract that continued essentially without expiration.  A contract with "substantially the same terms and conditions as embodied in the expired written contract," *Watts*, 591 N.Y.S.2d at 236, would include a comparable expiration provision of—at most— one year.  The written contract expired in February 2007, and the complaint fails to allege that plaintiff continued brokering an agreement after September 2007.  Thus, accepting plaintiff's allegations as true, any implied contract would have expired at some point in 2008 at the very latest; several years before the August 2011 acquisition was completed.

---

[5] Plaintiff vaguely alleges that it engaged in "periodic activity" to "effectuate the goals" of the December Amendment during the period of September 2007 through August 2011.  Am. Compl. ¶¶ 68–69.  For example, plaintiff asserts that it "continued to keep Verint informed" of Suntech's "product offerings and international traction."  *Id.* ¶ 68.  These conclusory allegations fail to plausibly allege that plaintiff continued to broker an agreement under the terms of any implied contract during this period.

The Court is mindful that the existence of an implied-in-fact contract is ordinarily a question of fact for the jury.  Yet the complaint fails to plausibly allege *any* facts suggesting that an implied contract continued in effect through the date of the Suntech acquisition.  Accordingly, defendant's motion to dismiss plaintiff's claim for breach of implied-in-fact contract is GRANTED.  The Court grants plaintiff leave to replead this claim.  *See Cruz v. TD Bank, N.A.,* 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.").

### D.  Breach of Contract Based on Intentional Delay or Prevention

Plaintiff argues that even if the Suntech acquisition was completed after the expiration of the contract, express or implied-in-fact, defendant breached the contract because it delayed the acquisition in order avoid paying plaintiff the compensation that it was otherwise due.  A broker may be entitled to receive a commission where, though the transaction took place after the terms of employment were terminated or expired, the termination was used in bad faith "as a mere device to escape the payment of the broker's commissions."  *Sibbald*, 83 N.Y. at 384; *accord Douglas Real Estate,* 148 N.E.2d at 905.  As the New York Court of Appeals explained:

> [I]f in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal.  But if the latter acts in good faith; not seeking to escape the payment of commissions, but moved fairly by a view of his own interest; he has the absolute right before a bargain is made while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor.

*Sibbald*, 83 N.Y. at 384–85.

The broader principal at issue, as courts have recognized, is that "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."  *Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of*

*New York*, 268 N.E.2d 782, 784 (N.Y. 1971).  This implied contractual obligation—the "prevention

doctrine"—"is often viewed as a corollary to the implied covenant of good faith."  *Indu Craft, Inc. v.

Bank of Baroda*, 47 F.3d 490, 498 (2d Cir. 1995); *see also Thor Properties, LLC v. Chetrit Grp. LLC*, 936

N.Y.S.2d 196, 198 (App. Div. 2012) (describing prevention doctrine as "a variant of the implied

covenant of good faith and fair dealing").

        Plaintiff alleges that defendant delayed completing the Suntech acquisition at two different

points in time, with the intent of avoiding payment under the contract.   First, plaintiff alleges that

defendant called off negotiations in February 2007, shortly before the December Amendment

expired on February 21, 2007.  However, this allegation fails to plausibly suggest that defendant

terminated the negotiations to escape payment.  Indeed, the complaint concedes that defendant did

not move forward with the acquisition at the time because "Verint became occupied with [a] major

acquisition" of Witness Systems, Am. Compl. ¶ 48, rather than to conclude the Suntech acquisition

on its own.  But even ignoring that fact, plaintiff alleges that it continued facilitating negotiations

with Suntech after the acquisition of Witness Systems.  Indeed, plaintiff contends that without its

efforts *after* February 2007, no further negotiations between defendant and Suntech would have

occurred.  Am. Compl. ¶ 60 ("[B]ut for ITM's best efforts in the summer of 2007, the discussions

and relationship between Suntech and Verint would not have proceeded.").  Accepting these

allegations as true, as the Court must, plaintiff fails to plausibly allege that any delay on defendant's

part in concluding the transaction in February 2007 was a "mere device" to avoid paying plaintiff its

compensation.

        Next, plaintiff argues that defendant again called off the Suntech acquisition in September

10, 2007, delaying the acquisition for nearly four years, with the intent of proceeding without

plaintiff's involvement.  As plaintiff notes, the considerable amount of time that defendant delayed

the transaction, standing alone, does not necessarily render plaintiff's claim implausible.  *See SPRE*

*Realty, Ltd. v. Dienst*, 986 N.Y.S.2d 92 (App. Div. 2014) (affirming denial of motion to dismiss where eighteen months passed between purported abandonment and closing of transaction); *but see Phoenix Capital Investments LLC v. Ellington Mgmt. Grp., L.L.C.*, 859 N.Y.S.2d 46, 48 (App. Div. 2008) (affirming decision granting motion to dismiss where plaintiff's "conclusory claim" alleged that defendant delayed investment for two years simply to avoid paying plaintiff's fee); *Yaras v. Levison Bros. Realty Corp.*, 305 N.Y.S.2d 686, 688 (App. Div. 1969) (unreasonable to infer bad faith in avoiding plaintiff's commissions where defendant concluded sale eleven years after terminating plaintiff's authority). Rather, it is the complete lack of *any* factual allegations plausibly suggesting that defendant delayed the transaction for nearly four years, in order to escape payment, that causes this claim to fail. Standing alone, plaintiff's conclusory allegations are insufficient to state a claim.

Because plaintiff fails to plausibly allege a breach of contract based on defendant's delay in consummating the transaction, defendant's motion to dismiss this claim is GRANTED. The Court grants plaintiff leave to replead this claim.

### E. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff argues that, independent of any breach of contract claim asserted, defendant's actions give rise to a separate cause of action for breach of the implied covenant of good faith and fair dealing. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (citing *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)). The implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (internal quotation marks omitted) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). "Where the contract contemplates the exercise of

discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton*, 663 N.E.2d at 291.

That said, a party cannot use the implied covenant to "add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (brackets, internal quotation marks, and citation omitted); *accord Murphy v. Am. Home Products Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."). Nor may the Court interpret the implied covenant to "extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)). "Whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).

Ordinarily, "[a] breach of the duty of good faith and fair dealing is considered a breach of contract." *Fishoff*, 634 F.3d at 653 (quoting *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir. 2004)). Courts have typically found that "raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan v. Verizon Corp.,* No. 08-cv-6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008) (citing *Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d 730, 731 (App. Div. 1995)); *accord Netologic, Inc. v. Goldman Sachs Grp., Inc.*, 972 N.Y.S.2d 33, 34–35 (App. Div. 2013) (dismissing implied covenant claims as duplicative of breach of contract

claims "since both claims arise from the same facts and seek identical damages for each alleged breach" (internal quotation marks and citation omitted)).

Nevertheless, courts have allowed an implied covenant claim to survive a motion to dismiss where "it is based on allegations different from those underlying the accompanying breach of contract claim." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-cv-9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) (quoting *Grand Heritage Mgmt., LLC v. Murphy,* No. 06-cv-5977 (NRB), 2007 WL 3355380, at *6 (S.D.N.Y. Nov. 5, 2007); *see also id.* at *7 (denying motion to dismiss claim based on implied covenant of good faith and fair dealing). Accordingly, "to simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *Id.* at *5.

Nearly all of the allegations identified by plaintiff as supporting an independent breach of implied covenant claim involve defendant's delay or motivation for its delay in acquiring Suntech. The Court addressed claims arising from the same set of facts as an alleged breach of contract claim under the prevention doctrine above. Any freestanding claim for a breach of the covenant of good faith and fair dealing, based on the same allegations, are redundant and must also be dismissed. *See ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003) (dismissing breach of implied covenant of good faith claim as duplicative of breach of contract claims where plaintiff "chose not to include the allegations that comprised its [breach of implied covenant of good faith] claim within the contents of the two breach of contract claims"); *see also Canstar*, 622 N.Y.S.2d at 731 (affirming dismissal of counterclaim as redundant because "a breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract").

Plaintiff also alleges that defendant breached the implied covenant by failing to include it in the negotiations with Suntech—which took place at some point prior to August 2011—that ultimately led to the acquisition.  Plaintiff's claim based on these allegations, however, must also fail as a matter of law.  Even assuming that defendant had an implied duty under the contract to notify plaintiff that it had reengaged Suntech in discussions, plaintiff has no cognizable claim for the breach of an implied obligation arising from an expired contract.  *See Keefe v. New York Law Sch.*, 897 N.Y.S.2d 94, 95 (App. Div. 2010) ("Absent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing.").  Because plaintiff fails to plausibly allege the existence of a contract at the time that defendant and Suntech resumed their negotiations, defendant's motion to dismiss the claim for breach of the implied covenant of good faith and fair dealing is GRANTED.  Because amending the complaint would be futile, plaintiff is denied leave to replead this claim.  *See Jordan*, 2008 WL 5209989, at *7 (denying leave to replead claim for breach of implied covenant of good faith and fair dealing).

### F.  Unjust Enrichment

Plaintiff next argues that defendant is liable for damages under an unjust enrichment or quantum meruit cause of action.  Under New York law, unjust enrichment and quantum meruit claims are analyzed together as a single quasi-contract claim.  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir. 2005).  This is because "quantum meruit and unjust enrichment are not separate causes of action; rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract."  *Di Simone v. CN Plumbing, Inc.,* No. 13-cv-5088, 2014 WL 1281728, at *6 (E.D.N.Y. Mar. 31, 2014) (internal quotation marks omitted) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 768 F. Supp. 89, 96 (S.D.N.Y. 1991) *rev'd on other grounds,* 959 F.2d 425 (2d Cir. 1992)).  "To prevail on a claim of unjust enrichment, a party

must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered . . . ." *Id.* at *5 (internal quotation marks omitted). "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson,* 418 F.3d at 175 (internal quotation marks omitted).

Here, plaintiff contends that it should be compensated for the hundreds of hours that it expended in support of the Suntech acquisition. Although plaintiff alleges that defendant benefited from these efforts, which it asserts laid the groundwork for the eventual acquisition of Suntech several years later on substantially the same terms, defendant failed to compensate or reimburse plaintiff. Thus, plaintiff seeks to recover for its' failed efforts in brokering an agreement in 2006–2007 because defendant, several years after the contract expired, eventually benefited from those efforts. Plaintiff may not do so.

The terms of the parties' agreement plainly preclude any recovery for plaintiff's failed efforts during the term of the contract. First, the contract states that plaintiff must "[b]ear all the expenses incurred by it in the performance of [its] obligations . . . and work at its own risk." Initial Agreement § 2.1. Moreover, the contract provides that, aside from the express compensation due in the event of an acquisition, no other payment or reimbursement was due, and defendant was not liable "for any business expenses, loss of profits, or incidental, indirect or consequential damages." Initial Agreement § 7; December Amendment § 2. The contract thus expressly excludes the very damages that plaintiff now seeks to recover. *See Axiom Capital Mgmt., Inc. v. Oracle Min. Corp.*, No. 12-cv-8967 (KBF), 2014 WL 1226479, at *15–16 (S.D.N.Y. Mar. 25, 2014) ("[W]hen a contract provides for payment only under certain limited circumstances and not others, the fact that work is performed

and not compensated is reflective of the bargain the parties struck and not a surprising or inequitable occurrence.").

More broadly, plaintiff may not recover under a quasi-contractual theory when the parties had a valid contract governing their relationship.  Under New York law, "the existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter."  *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 33–34 (N.Y. 2005) (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)); *accord* 22A N.Y. Jur. 2d Contracts § 538 ("A claim for restitution or unjust enrichment can exist only when there is no contract.").  Although the contract expired, plaintiff fails to allege that it incurred any expense apart from its performance of the contract during the contractual term.  Indeed, the expenses that plaintiff alleges under its quasi-contractual cause of action are identical to those sought for breach of contract.  *Compare* Am. Compl. ¶ 83 (alleging that plaintiff incurred "expenses of approximately $350,000" in accordance with its obligations under the December Amendment); *with* Am. Compl. ¶ 104 (seeking to recover "expenses amounting to approximately $350,000" under quasi-contractual claim).

Because plaintiff may not recover under a quasi-contractual theory for the very same damages that it is precluded from seeking under the contract, plaintiff's claim for unjust enrichment and quantum meruit are DISMISSED.  The Court grants plaintiff leave to replead this claim, to the extent that it seeks to allege a claim based on its efforts after the contractual term expired.

### G. Procuring Cause

Finally, plaintiff alleges that it is entitled to recovery as the "procuring cause" of the Suntech acquisition.  The "procuring cause doctrine" is not a separate cause of action, but rather generally applied within the real estate context to define when a broker is entitled to a commission.  *See Dagar Grp., Ltd. v. Hannaford Bros. Co.*, 745 N.Y.S.2d 34, 35 (App. Div. 2002) ("To earn a commission, a

broker must prove that he or she had a contract, either express or implied, with the party to be charged with paying the commission and that he or she was the procuring cause of the sale"); *UWC, Inc. v. Eagle Indus., Inc.*, 624 N.Y.S.2d 321, 322 (App. Div. 1995) (declining to extend procuring cause doctrine to agreement covering at-will sales representative).  In order to be a procuring cause of a transaction, "there must be a direct and proximate link, as distinguished from one that is indirect and remote," between the introduction by the broker and the consummation of the transaction. *Greene v. Hellman*, 412 N.E.2d 1301, 1307 (N.Y. 1980).  Whether a party is a procuring cause of a transaction is ordinarily a question of fact.  *See Williams Real Estate Co. v. Solow Dev. Corp.*, 348 N.E.2d 614, 615 (N.Y. 1976).

For the purposes of this motion, and in analyzing each of the causes of action, the Court accepts as true all facts alleged in the complaint regarding plaintiff's role in "procuring" the ultimate transaction.  *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 61 (2d Cir. 1997) (finding that district court erred in failing to consider whether plaintiff was procuring cause of real estate transaction when resolving quantum meruit claim).  Nevertheless, each of plaintiff's claims fails, for the reasons already discussed, even if the procuring cause doctrine is applicable in the instant context.

## IV.     CONCLUSION

For the reasons outlined above, defendants' motion to dismiss is GRANTED.  Plaintiff is granted leave to replead, as set forth above, no later than thirty days from the date of this order. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 39.

SO ORDERED.

Dated:  January 27, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge