UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

INTERNATIONAL TECHONOLOGIES
MARKETING, INC.,

                                    Plaintiff,

                 -against-

COGNYTE TECHNOLOGIES ISRAEL LTD.,

                                    Defendant.

------------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/19/2022
```

1:15-cv-2457-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

## I.      INTRODUCTION

For years, plaintiff International Technologies Marketing, Inc. ("Plaintiff" or "ITM")

pursued defendant Cognyte Technologies Israel Ltd., formerly known as Verint Systems, Ltd.

("Defendant" or "Cognyte"), for allegedly failing to compensate ITM for advising services it

provided between 2006 and 2007 in connection with a potential acquisition.  What began as a

straightforward contract dispute has become a six-year odyssey for Cognyte.  Several years of that

odyssey stemmed directly from ITM's bad-faith pursuit of a frivolous quantum meruit claim.  As a

result, Cognyte has asked the Court to impose monetary sanctions against ITM and its principal,

Anthony Schechtman, for litigation misconduct under both the Court's inherent authority and Rule

11.  For the reasons set forth below, the Court grants Cognyte's motion to impose sanctions

pursuant to its inherent authority but denies—under a plain-text reading of Rule 11—Cognyte's

motion for Rule 11 sanctions.

## II.     BACKGROUND

The Court presumes the reader's familiarity with this case.  The facts are described in several

of the Court's previous orders.  *See Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 357

(S.D.N.Y. 2016); *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-cv-2457, 2019 WL 1245013, at *1

(S.D.N.Y. Mar. 18, 2019), *aff'd*, 850 F. App'x 38 (2d Cir. 2021) (summary order).  What follows are the facts and procedural history that are particularly relevant to Cognyte's motions for sanctions.  *See* Dkt. Nos. 80–82, 218–21, 285–86.

ITM filed its initial complaint in March 2015, asserting various contractual and quasi-contractual claims against Cognyte.  Dkt. No. 1.  The complaint's basic allegations centered on Cognyte's alleged failure to compensate ITM for advising services related to work on a potential acquisition.  *Id.* at ¶¶ 67–90.  Most relevant here, ITM asserted that it should be compensated for $350,000 in costs that it had incurred during the period of its engagement under a claim of unjust enrichment, or in the alternative, under a claim of quantum meruit.  *Id.* ¶¶ 84–85.  Specifically, ITM alleged that it incurred $350,000 in costs while promoting Cognyte's entry into the Brazilian business and government markets, principally through the acquisition of Suntech, another technology company.  *Id.* ¶ 85.

ITM then filed an amended complaint (the "FAC") in July 2015.  Dkt. No. 27.  In the FAC, ITM reasserted its prior contract and quasi-contract claims—including the claim for unjust enrichment or quantum meruit—and added one additional claim.  *See id.* ¶¶ 77–113.  In January 2016, the Court dismissed the FAC in its entirety.  Dkt. No. 52.  As to the unjust enrichment or quantum meruit claim, the Court reasoned that ITM could not recover under a quasi-contractual theory for the same damages that it sought under a valid (though expired) 2006–2007 contract, which precluded relief on that basis.  *Id.* at 22–24.  The Court, however, permitted ITM to replead its unjust enrichment or quantum meruit claim, while cautioning that any such claim must be limited to ITM's efforts *after* the expiration of the contract.  *Id.* at 24.

ITM filed a second amended complaint (the "SAC") in February 2016.  Dkt. No. 62.  The SAC asserted claims for breach of contract, unjust enrichment or quantum meruit, and breach of an implied-in-fact contract.  *Id.* ¶¶ 84–109.  Cognyte asked the Court for permission to move to dismiss

this complaint and to file a motion for sanctions, arguing that ITM could not replead a contract claim that was dismissed by the Court with prejudice.  Dkt. No. 67.  Before the Court acted on that request, ITM filed a third amended complaint (the "TAC"), which abandoned the breach of contract claim, but restated the unjust enrichment or quantum meruit claim and the breach of an implied-in-fact contract claim.  Dkt. No. 73 ¶¶ 84–95.

In April 2016, Cognyte moved to dismiss the TAC.  Dkt. Nos. 77–78.  It also requested that the Court impose sanctions under Rule 11.  Dkt. Nos. 80–82.  In its sanctions motion, Cognyte observed that the quantum meruit claim in the TAC sought $350,000 for services rendered on Cognyte's behalf *after* the contract expired, while the quantum meruit claims asserted in the FAC sought an identical amount for efforts that it appeared to allege were undertaken *before and after* the contract expired.  Dkt. No. 82 at 11–12; *compare* FAC ¶ 76 (noting simply that "ITM incurred expenses on [a] project totaling approximately $350,000"), *with* TAC ¶ 83 (alleging that "*after February 2007*, ITM incurred expenses on [a] project totaling approximately $350,000" (emphasis added)).  The Court dismissed ITM's breach of implied-in-fact contract claim.  Dkt. No. 92 at 8:1–7.  The Court, however, allowed ITM to pursue its quantum meruit claim because Plaintiff "ha[d] represented" that "the TAC's claims for unjust enrichment" were limited to the period after the parties' express contract was in effect; the Court was required to "accept the allegations in the TAC as true for these purposes."  *Id.* at 9:11–10:6.  The Court also denied Cognyte's Rule 11 motion because it did "not have sufficient information at [the] time to conclude that counsel ha[d] violated his Rule 11 obligations."  *Id.* at 12:12–14.

After the Court's decision on the motion to dismiss, the parties engaged in discovery related to ITM's quantum meruit claim for the post-contractual period—the only claim remaining in the case.  Discovery was contentious.  ITM delayed document production and forced Cognyte to review thousands of irrelevant documents.  Dkt. No. 221 at 7.  ITM required eight extensions to complete

its document production.  *Id.*  ITM also represented that a neurological injury prevented Mr.

Schehtman from traveling to New York for his deposition even as he traveled to Israel to meet with

potential witnesses for this case.  *Id.* at 23–24; *see* Dkt. No. 124.  During a conference call in October

2017, Cognyte's counsel and ITM's then-counsel discussed the difficulty and delay in scheduling Mr.

Schehtman's deposition.  *See* Dkt. No. 220, Declaration of Howard I. Elman in Support of Verint's

Motion to Renew and Motion for Sanctions (the "Elman Decl.") ¶ 5.  Mr. Schehtman was deposed

in January 2018, one year after Cognyte served deposition notices on him.  *See* Dkt. Nos. 124 at 1,

152 at 7:9–10.

Mr. Schehtman's deposition testimony and related documents produced in discovery were

startling.  Mr. Schehtman admitted that—despite ITM's claim that it had regularly communicated

with high-level stakeholders and executives (the "Proxies") at Cognyte during the post-contractual

period, *see* TAC ¶¶ 70–71—he did not actually know whether any of the supposed Proxies actually

worked for Cognyte.  *See* Elman Decl. Ex. 3 at 299:11–302:2, 304:19–308:6, 74:12–75:17.  Mr.

Schehtman's testimony and other documents also revealed that Schehtman, far from working on

Cognyte's behalf in the post-contractual period (as would be necessary to support a quantum meruit

claim) instead worked *against* Cognyte's interests by assisting Cognyte's competitors during that time.

*See* Elman Decl. Ex. 4 at 375:16–22.  Mr. Schehtman stated that he intended to give Cognyte a

"bloody nose," *id.* at 389:17, and explained that he treated Cognyte as the enemy at certain points in

time, *id.* at 394:16–18.  In a May 2008 email to Suntech, Cognyte's then-competitor, Mr. Schehtman

wrote:  "[Y]ou have now enough dirt on [Cognyte] that if we lose any deal to them, we should be

ashamed."  Elman Decl. Ex. 29.  Mr. Schehtman also admitted that it was "very likely" that,

sometime during the contractual or post-contractual period, he told individuals that he believed that

Cognyte lacked integrity.  Elman Decl. Ex. 3 at 77:12–15.  Mr. Schehtman confessed that he worked

against Cognyte's interests multiple times.  *See, e.g., id.* at 77:17–21 (Mr. Schehtman explaining that he

"very likely" told a "competitor of [Cognyte] that it should target [Cognyte]'s installations"); *id.* at 77:22–25 (Mr. Schehtman acknowledging that he actively worked to prevent a Brazilian governmental agency from purchasing Cognyte's products).

Discovery also showed that many of the expenses that ITM had allegedly incurred on Cognyte's behalf were unrelated to Cognyte. In a response to an interrogatory, ITM claimed that its expenses totaled $399,407.71, including $160,000 in salary costs. *See* Elman Decl. Ex. 5 at 13. During his deposition, however, Mr. Schehtman confessed that ITM never paid that amount to employees. Elman Decl. Ex. 3 at 275:16–276:16. Mr. Schehtman had also listed thousands of dollars on trips, hotels, and a nightclub in Miami, and thousands more spent on a trip to Saint-Tropez, France, as charges allegedly undertaken on Cognyte's behalf. Elman Decl. Ex. 5 at 24–28. But in his deposition, Mr. Schehtman could not explain how any specific charge inured to Cognyte's benefit. Elman Decl. Ex. 3 at 267:5–272:3. And he also admitted that one expense allegedly undertaken on Cognyte's behalf was in fact a lunch with a *competitor* of Cognyte. Elman Decl. Ex. 4 at 404–405.[1]

In January 2018, ITM's then-counsel informed the Court of his conclusion that the quantum meruit claim as pled in the TAC should not move forward. *See* Dkt. No. 203 at 12–13. In April 2018, ITM sought leave to file a fourth amended complaint with no quantum meruit claim. Dkt. Nos. 181, 182 Ex. 1. Later that month, and before the Court took any action on ITM's motion to file a fourth amended complaint, the parties submitted a stipulation which provided that ITM would seek (and Cognyte would not oppose) the withdrawal of the quantum meruit claim with prejudice. Dkt. No. 194 at 1. In May 2018, Cognyte filed a motion for Rule 11 sanctions against ITM and its then-counsel based on ITM's attempt to file a fourth amended complaint. Dkt. Nos. 207–09. And

---

[1] Like the Court's prior orders describing this case's facts, this summary "only scratches the surface of ITM and Mr. Schehtman's questionable conduct." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-cv-2457, 2019 WL 1244493, at *5 (S.D.N.Y. Mar. 18, 2019), *rev'd in part by Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 370 (2d Cir. 2021).

in June 2018, Cognyte filed a motion asking the Court to impose sanctions under its inherent authority on ITM and Mr. Schehtman for their litigation misconduct and seeking leave to reargue its April 2016 Rule 11 motion.  Dkt. Nos. 218–21.

In March 2019, the Court issued two orders resolving outstanding issues in the case.  In its first order, the Court denied ITM leave to file its proposed fourth amended complaint, while granting its motion to withdraw its quantum meruit claim.  *Int'l Techs. Mktg.*, 2019 WL 1245013, at *3–6, *9.  The Court noted that the combination of those two actions "resolved" "all claims in this matter"—that is, nothing of substance remained of the case.  *Id.* at *9.  It also denied Cognyte's motion for Rule 11 sanctions based on ITM's attempt to submit a fourth amended complaint.  *Id.* at *6–8.  In the second order, the Court denied Cognyte's motion to sanction ITM and Mr. Schehtman under its inherent authority but granted Cognyte's request to renew its Rule 11 motion against ITM and its former counsel.  *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-cv-2457, 2019 WL 1244493, at *12 (S.D.N.Y. Mar. 18, 2019), *rev'd in part by Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 370 (2d Cir. 2021).  With respect to the Rule 11 motion, the Court found that "the sanctions [Cognyte sought] to impose on ITM are warranted," but declined to impose them immediately without further briefing on the matter.  *Id.*

The Second Circuit Court of Appeals affirmed, in its entirety, the first order dismissing ITM's attempt to file a fourth amended complaint and denying Cognyte's motion for Rule 11 sanctions based on that attempted filing.  *Int'l Techs. Mktg.*, 850 F. App'x at 42–45.[2]  In a separate decision, however, the Circuit reversed and remanded this Court's order denying Cognyte's motion to sanction ITM and Mr. Schehtman under the Court's inherent authority.  *Int'l Techs. Mktg*, 991 F.3d at 370.  It noted that the only requirements for imposing sanctions based on prosecuting a knowingly frivolous claim are that "the challenged claim [is] without a colorable basis" and that "the

---

[2] It also affirmed a prior order dismissing ITM's breach of contract claim.  *See Int'l Techs. Mktg*, 850 F. App'x at 40–42.

claim [is] brought in bad faith." *Id.* at 368 (quoting *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012)).  This Court's order, however, had "grafted onto" those two prongs "additional requirements" that "should not have been given dispositive effect."  *Id.*  So the Second Circuit remanded the case for reconsideration of sanctions, while noting that it was not "prejudging whether sanctions should be imposed" because that issue "remains within the careful discretion of the district court."  *Id.* at 370.

In April 2021, Cognyte withdrew all pending requests for sanctions against ITM's former counsel, leaving only ITM and Mr. Schehtman subject to its sanctions motions.  Dkt. Nos. 272, 275. And in August 2021, Cognyte filed a memorandum of law and supporting exhibits in further support of its motions for sanctions under this Court's inherent authority against Mr. Schehtman and under both this Court's inherent authority and Rule 11 against ITM.  *See* Dkt. Nos. 285–86.

## III.   DISCUSSION

### A.  Legal Standards

#### 1.   The Court's Inherent Power to Impose Sanctions

"[The] authority to impose sanctions is grounded, first and foremost, in [the] inherent power to control the proceedings that take place before this Court."  *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013).  "This power stems from the very nature of courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 948 F.2d 1338, 1345 (2d Cir. 1991) (internal citations omitted).  Because of the "very potency" of the inherent contempt powers, however, courts must exercise them "with restraint and discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (internal citation omitted).

"[A] district court has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Sassower v. Field*, 973 F.2d 75, 80–81 (2d

Cir. 1992).  Imposing sanctions in this instance serves to "vindicat[e] judicial authority" and make the wronged party "whole for expenses caused by his opponent's obstinacy."  *Chambers*, 501 U.S. at 46 (internal citation omitted).

"In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay."  *Enmon*, 675 F.3d at 143 (internal citation omitted).  "Although both findings must be supported by a high degree of specificity in the factual findings, bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay*." Id.*  (internal citations omitted).  "[B]ad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."  *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (internal citation omitted).  A claim is "entirely without color when it lacks any legal or factual basis.  Conversely, a claim is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim."  *Schlaifer Nance & Co. Inc. v. Estate of Warhol*, 194 F.3d 323, 336–37 (2d Cir. 1999) (internal citations omitted) (emphasis removed).

"[S]anctions may be warranted even where bad-faith conduct does not disrupt the litigation before the sanctioning court.  This accords with [the] sanctions jurisprudence, which counsels district courts to focus on the purpose rather than the effect of the sanctioned attorney's activities."  *Enmon*, 675 F.3d at 145.  Furthermore, "[a] court need not wait until a party commits multiple misrepresentations before it may put a stop to the party's chicanery."  *Int'l Techs. Mktg.*, 991 F.3d at 369.  "[T]he effect of and number of misrepresentations that a party makes are perfectly acceptable data points for a court to consider in determining whether—and, perhaps more importantly, *what*—sanctions are warranted.  But neither fact should be given dispositive weight."

*Id.* (internal citation omitted).  Finally, a finding that a litigant successfully defrauded the court is sufficient grounds for imposing monetary sanctions, but it is not necessary.  *See Va. Props., LLC v. T-Mobile Ne. LLC*, 865 F.3d 110, 114, 123 (2d Cir. 2017) (concluding that while the plaintiff did not "commit[ ] a fraud on the court," sanctions in "the amount of costs and attorney's fees" could nevertheless still be awarded on remand "to compensate appellees for the failure of [the plaintiff] or its attorneys to make timely disclosures").

### 2.  Authority to Sanction a Nonparty

"To impose sanctions on a nonparty . . . the violation of a court order is . . . generally required."  *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, No. 07-cv-3635, 2008 WL 3852046, at *2 (S.D.N.Y. Aug. 13, 2008).  But there are exceptions to that general rule.  Sanctions on third parties have been imposed, particularly when the third party controlled the sanctionable conduct of a litigant.  *See Amerisource Corp. v. Rx USA Int'l Inc.*, No. 02-cv-2514, 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010), *aff'd sub nom. N.Y. Credit & Fin. Mgmt. Grp.*, 432 F. App'x 25 (2d Cir. 2011) (summary order) (sanctioning a nonparty principal because he was the "majority shareholder, chief executive, and only person affiliated with [the defendant] to have a substantive role in [the] litigation[]" and "[h]e managed the litigation on [the defendant's] behalf and represented [the defendant] at every step"); *see also Saravia v. Royal Guard Fence Co.*, No. 19-cv-2086, 2020 WL 5231696, at *7 (E.D.N.Y. Sept. 2, 2020) (sanctioning a nonparty witness because "he ha[d] aligned himself closely with Defendants in [the] litigation, including playing a critical role on Defendant's behalf in the events leading up to the evidentiary hearing").

### 3.  Sanctions Award

"One component of a court's inherent power is the power to assess costs and attorneys' fees against either the client or his attorney where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 104 (2d Cir. 2006) (quoting *United*

*States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991)).  A party seeking an award of attorneys' fees must support its request with contemporaneous time records that show "for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  District courts have "considerable discretion" in determining what constitutes a reasonable award of attorneys' fees. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).  Even so, the Second Circuit has directed that district "courts should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Restivo v. Hessemann*, 846 F.3d 547, 590 (2d Cir. 2017) (quoting *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)).  Those hourly rates "are the market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).

In determining a reasonable hourly fee, the Second Circuit has also instructed district courts to consider "all of the case-specific variables." *Arbor Hill*, 522 F.3d at 190.  The touchstone inquiry is "what a reasonable, paying client would be willing to pay." *Id.* at 184; *see id.* at 191 ("By asking what a reasonable, paying client would do, a district court best approximates the workings of today's market for legal services.").  The court should "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively" and "should also consider that [a client] might be able to negotiate with his or her attorneys." *Id.* at 190.  A district court may additionally factor into its determination "the difficulty of the questions involved[,] the skill required to handle the problem[,] the time and labor required[,] the lawyer's experience, ability and reputation[,] the customary fee charged by the Bar for similar services[,] and the amount involved." *OZ Mgmt. LP v. Ozdeal Inv. Consultants, Inc.*, No. 09-cv-8665, 2010 WL 5538552, at *2 (S.D.N.Y. Dec. 6, 2010) (alterations in original) (quoting *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250,

1263 (2d Cir. 1987)), *report and recommendation adopted*, No. 09-cv-8665, 2011 WL 43459 (S.D.N.Y. Jan. 5, 2011).

 An applicant for an award of fees bears "the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.  The applicant should exercise 'billing judgment' with respect to hours worked and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (footnote omitted).  "The critical inquiry is whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures."  *Flores v. J&B Club House Tavern, Inc.*, No. 10-cv-4332, 2012 WL 4891888, at *5 (S.D.N.Y. Oct. 16, 2012) (internal citation omitted).  "A district court should reduce the number of hours included in the fee calculation if the claimed time is 'excessive, redundant, or otherwise unnecessary.'"  *Luessenhop v. Clinton Cnty.*, 324 F. App'x 125, 126-27 (2d Cir. 2009) (summary order) (quoting *Hensley*, 461 U.S. at 434).  In the event a district court reduces the number of hours included in the calculation of fees, it "must ordinarily state its reasons for excluding those hours 'as specifically as possible' in order to permit meaningful appellate review."  *Gierlinger*, 160 F.3d at 876 (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998)).

### 4.  Rule 11

 Federal Rule of Civil Procedure 11(b) requires that an attorney filing a motion certify, "to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically
> so identified, will likely have evidentiary support after a reasonable
> opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or,
> if specifically so identified, are reasonably based on belief or a lack of
> information.

Fed. R. Civ. P. 11(b).  To establish a violation of Rule 11(b)(2), it must be "patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands." *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 179 (S.D.N.Y. 2008) (internal citation omitted).  Although, as a general matter, Rule 11 does not impose a continuing obligation on the presenter to update, correct or withdraw any pleading, written motion or other paper which, when presented, satisfies the requirements of the Rule, Rule 11 is nevertheless implicated "where an attorney or party declines to withdraw a claim upon an express request by his or her adversary after learning that [the claim is] groundless." *Azuike v. BNY Mellon*, 962 F. Supp. 2d 591, 597 (S.D.N.Y. 2013) (internal citation and quotations omitted); *see also Galin v. Hamada*, 283 F. Supp. 3d 189, 203 (S.D.N.Y. 2017) ("Thus, the Court concludes that, once discovery closed, Galin and his counsel had an obligation under Rule 11 to withdraw the [c]omplaint because they knew—by that point if not earlier—that their allegations on the central (and dispositive) issue in the case were utterly lacking in support.") (internal citation omitted).

Courts maintain a high bar for establishing a Rule 11 violation given judicial concern for encouraging zealous advocacy.  *E. Gluck Corp.*, 252 F.R.D. at 179.  However, if "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  "[I]f the district court concludes that the assertion of a given claim violates Rule 11 . . . the decision whether or not to impose sanctions is a matter for the court's discretion."  *Bobcar Media,*

*LLC v. Aardvark Event Logistics, Inc.*, No. 16-cv-885, 2019 WL 422613, at *2 (S.D.N.Y. Feb. 4, 2019) (citing *Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir. 2004)).

### B. Analysis

Cognyte seeks sanctions against ITM and Mr. Schechtman for prosecuting the quantum meruit claim in bad faith. The Court finds that sanctions are warranted in the amount of $895,397.85, pursuant to the Court's inherent authority, against both ITM and Mr. Schechtman. The Court also finds, however, that Rule 11's text precludes sanctions against ITM on that basis.

#### 1. Sanctions Pursuant to the Court's Inherent Authority

##### i. *Sanctions Against ITM*

Sanctions are warranted against ITM pursuant to the Court's inherent authority. A court's inherent power allows it to impose monetary sanctions against a litigant, or its counsel, for misconduct. *See Chambers*, 501 U.S. at 45–46. "One type of bad faith conduct that is often deserving of sanction is a party's decision to prosecute a knowingly frivolous claim." *Int'l Tech. Mktg.*, 991 F.3d at 368. In order to sanction a party or others for such a decision, a district court must make two findings: "first, that 'the challenged claim was without a colorable basis' and, second, that 'the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay.'" *Id.* (quoting *Enmon,* 675 F.3d at 143). A claim is without a colorable basis when it "lacks any legal or factual basis." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). And bad faith may be inferred when an action is "so completely without merit as to require the conclusion that [it] must have been undertaken for some improper purpose such as delay." *Enmon*, 675 F.3d at 143 (internal citation omitted).

The quantum meruit claim in ITM's TAC was without a colorable basis. As explained above, in the TAC, ITM alleged a claim for unjust enrichment or quantum meruit and sought to recover "the full value of ITM's services to [Cognyte]." TAC ¶ 90. ITM represented that it had

incurred approximately $350,000 in expenses in the period after February 21, 2007—the date on which the contract between the parties expired.  *Id.* ¶ 86.  When Cognyte moved to dismiss the TAC, the Court inquired about the quantum meruit claim and ITM, through its then-counsel, affirmed that evidence existed to support ITM's representation that it expended $350,000 on Cognyte's behalf after the contract between them had expired.  Dkt. No. 75 at 6.

But Mr. Schehtman's deposition testimony and documents produced in discovery exposed that claim as "lack[ing] any legal or factual basis."  *Wolters Kluwer*, 564 F.3d at 114 (2d Cir. 2009).  To state a claim for quantum meruit, a party must allege "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host. Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).  Mr. Schehtman's deposition testimony, far from demonstrating performance of services in good faith, suggested that he intended to harm Cognyte.  Mr. Schehtman explained that he aided Cognyte's competitors and treated Cognyte as an enemy.  *See* Elman Decl. Ex. 4 at 375:9–376:22; 394:15–17.  And Mr. Schehtman also admitted that he did not know whether the Proxies—who he previously alleged accepted ITM's services—actually worked for Cognyte.  *See* Elman Decl. Ex. 3 at 74:12–75:4, 299:11–302:2, 304:19–307:7.  Perhaps most damningly, even after ITM assured the Court—despite the Court's skepticism—that it had incurred $350,000 in expenses on Cognyte's behalf *after* the contractual period, discovery revealed that many of those expenses were unrelated personal charges; Mr. Schehtman, further, could not explain how these charges benefitted Cognyte.  *See, e.g.*, Elman Decl. Ex. 3 at 267:5–272:3.  And "Mr. Schehtman's deposition testimony illustrate[d] that ITM either did not undertake a reasonable inquiry into whether the factual allegations for the quantum meruit claim had evidentiary support before submitting the TAC, or—if it undertook the inquiry—that ITM submitted the TAC despite knowing that no such evidentiary basis existed."  *Int'l Techs. Mktg.*, 2019

WL 124493, at *12.  Either way, the quantum meruit claim was without any basis in law or fact, thus satisfying the first prong for imposing sanctions based on party's decision to prosecute a knowingly frivolous claim.  *See Wolters Kluwer*, 564 F.3d at 114 (2d Cir. 2009).

The Court also finds that the quantum meruit claim was brought in bad faith.  Bad faith may be inferred when an action is "so completely without merit as to require the conclusion that [it] must have been undertaken for some improper purpose such as delay."  *Enmon*, 675 F.3d at 143 (internal citation omitted).  Here, for the reasons discussed above, the quantum meruit claim was completely meritless.  And while what matters most in a finding of bad faith is "the *intent* of the potentially sanctionable conduct, not . . . its *effect*," the disruption that the quantum meruit claim did cause to both the Court and opposing counsel provides additional evidence that it was undertaken in bad faith.  *Int'l Techs. Mktg.*, 991 F.3d at 398.  Because Cognyte's motion to dismiss the TAC was granted except as to the quantum meruit claim, ITM's case would have ended in November 2016 but for that claim's existence.  *See* Dkt. No. 92.  Instead of the case ending, however, years of agonizing and contentious discovery concerning the previously discussed frivolous factual allegations made related to the quantum meruit claim ensued.  All of this was undertaken because ITM affirmed, erroneously and misleadingly, that evidentiary support existed to support its representation that it expended $350,000 on Cognyte's behalf after the contract between them expired.  Dkt. No. 75 at 6.  These circumstances suggest both a motive for a bad faith claim—to keep an otherwise-doomed case afloat—and demonstrate the enormous cost that ITM's decision to pursue the bad faith claim imposed on Cognyte and the Court.  The Court accordingly finds that ITM's quantum meruit claim was brought without a colorable basis and in bad faith, and that sanctions are warranted against ITM on that basis.

<em>ii.     Sanctions Against Mr. Schehtman</em>

Sanctions are also warranted against Mr. Schehtman pursuant to this Court's inherent authority.  Typically, nonparties are not subject to sanctions unless they violate a court order.  *See Cont'l Ins. Co.*, 2008 WL 3852046, at *2.  But an exception to that general rule may be found in a circumstance such as this, where a nonparty is "the only person affiliated with the [sanctionable party] to have a substantive role in th[e] litigation" such that the party's misconduct is fairly attributable to him.  *Amerisource Corp.*, 2010 WL 2730748, at *5; *see also Elec. Workers Pension Trust Fund of Local Union 58 v. Gary's Elec.*, 340 F.3d 373, 383 (6th Cir. 2003) (holding that "if a corporate officer avoids a court's order to the corporation by failing to take action or attempt compliance," the officer may be punished for contempt and "it is fully appropriate to impose judicial sanctions on the nonparty corporate officer" (internal quotation omitted)).  Here, Mr. Schehtman served in such a role for ITM.  Mr. Schehtman is ITM's President, sole shareholder, and only employee.  Elman Decl. Ex. 3 at 24:6–19.  He has played a critical role in this litigation, submitting several declarations, attending court appearances, and participating in calls with the Court.  *See, e.g.*, Dkt. Nos. 144, 169, 186, 211, 213, 240.  Because of ITM's six changes of counsel throughout the litigation, Mr. Schehtman has been more involved than expected, and now represents himself.  Dkt. No. 281.  And as detailed above, Mr. Schehtman is the individual primarily responsible for the misconduct identified in the proceedings.  Accordingly, the Court finds that ITM's litigation misconduct can be fairly attributed to Mr. Schehtman personally, and that the Court therefore has the inherent authority to sanction Mr. Schehtman for his litigation misconduct.[3]

---

[3] Mr. Schehtman has also received adequate notice of Cognyte's motion for inherent powers sanctions against him and has had an adequate opportunity to respond to it.  When Cognyte first moved for this Court to impose inherent-power sanctions on Mr. Schehtman and other entities, Mr. Schehtman responded by submitting a declaration in opposition.  *See* Dkt. No. 240 ¶ 1.  The Court also stayed this action to allow Mr. Schehtman to find new counsel after his latest counsel withdrew, Dkt. No. 277—but Mr. Schehtman chose instead to represent himself.  In short, there is no question that Mr. Schehtman understood that Cognyte was seeking sanctions against him and has had ample opportunity to respond.

### 2.  Sanctions Award

Having found that ITM and Mr. Schehtman acted in bad faith in pursuing their frivolous quantum meruit claim, the Court must determine the appropriate sanctions to impose.  Cognyte seeks "severe sanctions, in the form of a sizable reimbursement of Cognyte's attorneys' fees and costs."  Dkt. No. 286 at 7.  Specifically, Cognyte alleges that it is entitled to $980,125.52 for the "legal services for the period of March 29, 2016 through June 8, 2018."  Dkt. No. 285 ¶ 30.  That is the time period between when ITM filed its TAC and when Cognyte filed its motion to renew its original Rule 11 motion and for sanctions under the Court's inherent powers.  *Id.* ¶ 3.  ITM counters that any sanctions awarded should be nonmonetary or a payment to the Court, rather than a payment of attorneys' fees.  Dkt. No. 256 at 7.  For the reasons explained below, the Court will sanction ITM and Mr. Schehtman for $895,397.85, and require them to pay that amount to Cognyte.

To start, the Court finds payment of attorneys' fees appropriate in this case.  "[T]he underlying purpose of sanctions [is] to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring further violations . . . ."  *Oliveri*, 803 F.2d at 1281; *see also* Fed. R. Civ. P. 11(c)(4).  Awards of attorneys' fees are also justified to compensate attorneys for the expenses associated with the "mountainous expense and waste of financial resources" that can accrue from litigation misconduct.  *Chambers*, 501 U.S. at 57.  Here, as described above, the filing of the TAC was wholly dependent upon frivolous legal and factual allegations.  And as a direct result of that filing, Cognyte was forced to expend substantial litigation resources where it otherwise would not have been required to do so.  So a sanction of attorneys' fees is justified both to deter ITM, Mr. Schehtman, and similarly situated parties from making analogously frivolous filings in the future, and to compensate Cognyte for the time and effort it expended in defending against the TAC.  Accordingly, the Court will proceed to analyzing whether, and to what extent, the rates and hours underlying Cognyte's requested sanction of $980,125.52 are reasonable.

As an initial matter, the Court will not consider sanctions outside of the work done by Howard I. Elman, Yosef Rothstein, and Jeremy C. Bates.  An applicant for an award of fees bears "the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437.  Here, Mr. Elman has provided the hourly rates—and justification for those rates—for himself, Mr. Rothstein, and Mr. Bates.  Dkt. No. 285 ¶¶ 23–28 (identifying the rates of these three individuals—but no one else—as "reasonable given [their] education, experience, and standing in the profession, and given the fact that [they] usually practice in New York County"); Dkt. No. 285 Ex. 2 (providing biographies of those three individuals but no one else).  So the Court has no information from which to assess the appropriateness of the billing charges by the other attorneys who worked on this case:  Allen Mukaida, Jeffrey E. Slavin, Jon Avins, Lindsay Sklar, Michael Gregerson, and Yelena Rapoport.  *See* Dkt. No. 285 Ex. A at 63.  Nor can the Court properly assess the "Additional Charges" identified as "MSE" in Cognyte's timekeeping records because the charges are not otherwise explained in Cognyte's filings.  *Id.* at 59–63.

Attorneys Mukaida, Slavin, Avins, Sklar, Gregerson, and Rapoport billed a combined $53,271.48 in the identified time period.  *Id.* at 63.  And $31,456.19 was billed to the aforementioned "MSE."  *Id.*  With both these figures subtracted from the total amount, Cognyte is left with $895,397.85 in sought attorneys' fees that the Court will consider.

*i.    Reasonable Rates*

The Court finds that the rates changed by Mr. Elman, Mr. Rothstein, and Mr. Bates during the relevant time period were reasonable.  During that period, Mr. Elman's hourly rate was $585 per hour, while Mr. Rothstein and Mr. Bates each billed at a rate of $456.50 per hour.  *Id.*  These rates are reasonable because they are all within the band for hourly rates approved in this district for attorneys at New York City law firms involved in complex commercial litigation.  *See, e.g.*, *Flatiron*

*Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-cv-8987, 2022 WL 413229, at \*14 (S.D.N.Y. Feb. 9, 2022) (Woods, J.) (approving rates between $405 to $660 for associates and between $741 to $910 for partners in a complex commercial litigation case); *Themis Cap. v. Democratic Rep. of Congo*, No. 09-cv-1652, 2014 WL 4379100, at \*7 (S.D.N.Y. Sept. 4, 2014) (observing that "partner billing rates in excess of $1,000 an hour[ ] are by now not uncommon in the context of complex commercial litigation"); *Tessemae's LLC v. Atlantis Cap. LLC*, 18-cv-4902, 2019 WL 2635956, at \*4 (S.D.N.Y. June 27, 2019) (collecting cases supporting reasonableness of "hourly rates ranging from $250 to $1,260 per hour[ ] for attorneys' work on a commercial litigation matter"); *LCS Grp. L.L.C. v. Shire L.L.C.*, 383 F. Supp. 3d 274, 279–80 (S.D.N.Y. 2019) (awarding $868 per hour for partners and $449.50 for an associate); *MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*, No. 16-cv-8103, 2017 WL 1194372, at \*3 (S.D.N.Y. Mar. 30, 2017) (accepting hourly rates between $569.02 and $753.42 per hour for associates depending on seniority); *Errant Gene Therapeutic, LLC v. Sloane-Kettering Inst. for Cancer Rsch.*, 286 F. Supp. 3d 585, 588 (S.D.N.Y. 2018) (accepting partner hourly rate of $765); *Vista Outdoor Inc. v. Reeves Family Tr.*, No. 16-cv-5766, 2018 WL 3104631, at \*5–6 (S.D.N.Y. May 24, 2018) (approving rates up to $1,260 for partners).

During the relevant time period, Mr. Elman was a managing member of Matalon Shweky Elman, PLLC, while Mr. Rothstein and Mr. Bates were counsel at the firm. Dkt. No. 285 ¶ 23. All three had substantial experience in commercial litigation in New York, having been admitted to the New York bar between 1993 and 2003. *Id.* ¶ 24; *see also* Dkt. No. 285 Ex. B (detailing the extensive experience of Mr. Elman, Mr. Rothstein, and Mr. Bates). And Mr. Elman has stated that the rates charged by himself, Mr. Rothstein, and Mr. Bates in this matter "were [their] regular rates across many matters at the time of the filing of the original complaint, and [they] did not raise the rate [they] were charging Cognyte during the pendency of the matter." Dkt. No. 285 ¶ 25. These

uncontested facts support the reasonableness of the rates charged by Mr. Elman, Mr. Rothstein, and Mr. Bates.

Nor is there any evidence that Mr. Elman, Mr. Rothstein, or Mr. Bates performed work that could have been performed by attorneys compensated at a lesser rate. "Attorneys who are overqualified for clerical tasks are not allowed to be paid at their hourly rate for this work." *FameFlyNet, Inc. v. Shoshanna Collection, LLC*, No. 16-cv-7645, 2018 WL 671267, at *3 (S.D.N.Y. Feb. 1, 2018). The records submitted by Cognyte, however, provide sufficient detail of the work done by Mr. Elman, Mr. Rothstein, and Mr. Bates for the Court to conclude that their work was substantive and necessary to the case. *See generally* Dkt. No. 285 Ex. A. Indeed, those records show that clerical tasks were performed instead by other associates compensated at lower rates. *See, e.g., id.* at 6 (other associates prepared a binder for the case and prepared courtesy copies of motions papers for the Court), 8 (other associate completed updating of calendar and files). Because the Court will not consider the work done by those associates as part of the overall sanctions award, there is no cause to further reduce the amount sought by Cognyte based on clerical tasks performed.

### ii. Reasonable Hours

The Court also finds that Mr. Elman, Mr. Rothstein, and Mr. Bates worked reasonable hours on this case during the relevant time period. During that period, Mr. Elman billed 341.30 hours to this case, Mr. Rothstein billed 1,306.70 hours, and Mr. Bates billed 287.20 hours. Dkt. No. 285 ¶ 26; Dkt. No. 285 Ex. A at 63. While this represents a significant amount of time dedicated to the case, given the complexity and difficulty of events during the period that the TAC was filed, "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Flores*, 2012 WL 4891888, at *5. Of particular note is that Cognyte would have accrued far fewer billing hours absent ITM and Mr. Schehtman's litigation misconduct. Consider, as just one small example, time spent preparing for Mr. Schehtman's deposition. Cognyte served its original

deposition notices for Mr. Schehtman on January 13, 2017.  Dkt. No. 124 at 1.  After ITM and Mr. Schehtman delayed deposition for months, Cognyte proposed specific dates in September 2017 for Mr. Schehtman's deposition to occur.  *Id.*  But ITM avoided making Mr. Schehtman available through a series of shifting justifications; it eventually asserted that he could not travel for the deposition despite Mr. Schehtman having taken a trip, during the same period, from the United Kingdom to Israel.  *Id.* at 1–3.  In December 2017, ITM requested an extension of the deadline for Mr. Schehtman to be deposed, which was granted.  Dkt. Nos. 136, 139.  So Mr. Schehtman was eventually deposed in mid-January 2018.  *See* Dkt. Nos. 139 at 1, 152 at 7:9–10.

The invoices submitted by Cognyte indicate that Mr. Elman engaged in 3.8 hours of preparation for the proposed Mr. Schehtman deposition in September 2017.  Dkt. No. 285 Ex. A at 28.  But after the deposition was pushed back, Mr. Elman and Mr. Rothstein spent an additional 11.18 hours preparing for that deposition or preparing for calls related to it.  *Id.* at 32, 35–36.  And that does not include all the additional time spent attempting to get ITM to comply with Cognyte's request to depose Mr. Schehtman in the first place, which required multiple letters to the Court and conferences to resolve.  *See* Dkt. No. 285 ¶ 27.  It would be patently unjust to penalize Cognyte, through a reduction of sanctions, for additional time spent on this case that directly resulted from the misconduct of ITM and Mr. Schehtman.

Mr. Schehtman's deposition, moreover, is just one of many areas where ITM and Mr. Schehtman's conduct extended litigation—and thus necessarily expanded the number of hours that Mr. Elman, Mr. Rothstein, and Mr. Bates were required to work on the case.  *See id.* (noting the additional hours that had to be spent communicating with ITM's oft-changing counsel, moving for an anti-suit injunction when ITM attempted to file a suit in Israel to evade this Court's rulings, and preparing for seventeen court conferences related to the shifting issues in the case).  If the hours spent by Mr. Elman, Mr. Rothstein, and Mr. Bates on this case were abnormally high, that was only

because the abnormal litigation conduct from ITM and Mr. Schehtman made this an abnormally

lengthy and complicated case.  In short, the evidence and declarations provided by Cognyte amply

supports the time that Mr. Elman, Mr. Rothstein, and Mr. Bates have averred that they spent on this

case during the relevant time period.  Accordingly, the Court finds ITM and Mr. Schehtman jointly

and severally liable to Cognyte for $895,397.85 in sanctions.

### 3.  Rule 11 Sanctions

While the substantial sanctions that this Court has awarded Cognyte under its inherent

power may make the issue of Rule 11 sanctions more academic than practical, the Court is

nonetheless dutybound to consider that motion.  *See* Dkt. No. 286 at 1 n.1 (noting the two separate

motions Cognyte is pursuing).  Doing so, the Court concludes that the plain text of Rule 11

precludes any sanctions under that Rule against ITM because Cognyte is not pursuing sanctions

against ITM's counsel.

Cognyte seeks sanctions against ITM under Rule 11(c).  In relevant part, that rule reads:

> If . . . the court determines that Rule 11(b) has been violated, the court may impose
> an appropriate sanction on any attorney, law firm, or party that violated the rule or is
> responsible for the violation.

Fed R. Civ. P. 11(c)(1).  Sanctions can thus be awarded under the rule against parties like ITM only if

"the court determines that Rule 11(b) has been violated," and that the party is responsible for that

violation.  *Id.*

Here, however, the Court is precluded from making the predicate determination that Rule

11(b) has been violated.  That rule, as relevant, reads:

> By presenting to the court a pleading, written motion, or other paper—whether by
> signing, filing, submitting, or later advocating it—*an attorney or unrepresented party*

certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose . . .
> (2) the claims, defenses, and other legal contentions are warranted by existing law . . .
> (3) the factual contentions have evidentiary support . . . and
> (4) the denials of factual contentions are warranted on the evidence . . . .

Fed. R. Civ. P. 11(b) (emphasis added).  That text makes only "attorney[s]" and "unrepresented part[ies]" subject to Rule 11(b)'s strictures, which means that only those individuals can violate it.  And here, the litigation misconduct Cognyte points to was undertaken by ITM while it was represented by counsel—and thus not itself subject to Rule 11(b) in the first place.

It must be noted that despite that text, courts in this circuit have split on the issue of whether represented parties may themselves be held responsible for violating Rule 11(b).  Several have suggested that represented parties may be sanctioned, in particular, for violating Rule 11(b)(3), even without finding an attorney responsible for a Rule 11(b) violation.  *See De Jesus-Keolamphu v. Vill. of Pelham Manor*, 999 F. Supp. 556, 568 (S.D.N.Y. 1998) ("Although the parties themselves are not liable under Rule 11 for legally frivolous claims, they may be sanctioned for totally meritless factual allegations."); *Nyitray v. Johnson*, No. 96-cv-6150, 1998 WL 67651, at *14 (S.D.N.Y. Feb. 19, 1998) ("[A]lthough a party represented by counsel is not liable under Rule 11 for claims that are legally flawed, *see* Fed. R. Civ. P. 11(c)(2)(A), he is liable for factual contentions that lack evidentiary support.  See Fed. R. Civ. P. 11(b)(3).").  Indeed, in a previous order in this case, this Court—citing *De Jesus*—wrote that "[t]he Court can sanction a represented party" for violating Rule 11(b)(3), and ultimately found that "the [Rule 11] sanctions [Cognyte] sought to impose on ITM [were] warranted" even as it declined to find that ITM's counsel violated Rule 11(b).  *Int'l Techs. Mktg.*, 2019 WL 1244493, at *11–12.  But having further considered the issue, the Court finds that view to be mistaken.

Instead, the Court is convinced by the thoughtful analysis of this issue by Judge McMahon in *Advanced Video Technologies LLC v. HTC Corp.*, Nos. 1:11-cv-6604, 1:11-cv-8908, 1:12-cv-918, 2015 WL 7621483 (S.D.N.Y. Aug. 28, 2015). Judge McMahon first declined to find that counsel in that case had violated Rule 11(b). *Id.* at *13. And "[t]hat being so," she found, there was "no basis to impose Rule 11 sanctions on [the represented party] itself." *Id.* As Judge McMahon wrote:

> I cannot impose Rule 11 sanctions on a represented party . . . unless I find a Rule 11(b) violation by counsel. Fed. R. Civ. 11(c)(1) ("If . . . the court *determines that Rule 11(b) has been violated*, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." (Emphasis added)). That is because Rule 11(b)'s certification requirements only apply to "an attorney or unrepresented party" who "present[s] to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it." Fed. R. Civ. P. 11(b). The Rule's certification requirements do not apply to a represented party. To be sure, [the party] could have derivative liability for a Rule 11 violation by its attorneys; "a sanction for attorneys' fees may be imposed either on the attorney who signs a paper, or on the party he represents, or on both." *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir. 1986); *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991) ("Rule 11 subjects the client—'the represented party'—to sanctions even if he has not signed the offending paper."). But there can be no derivative liability where no primary liability is imposed.

*Id.*

The Court now sees it as Judge McMahon saw it. To be clear, there is no question that once a court finds that Rule 11(b) has been violated by an attorney or unrepresented party, sanctions may be awarded against any "attorney, law firm, *or* party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1) (emphasis added). So a party (or law firm) that causes an attorney to commit a Rule 11(b) violation may be sanctioned even if the attorney is not; in cases where the party is primarily at fault for the filing of the offending document, such a determination makes good sense. *See, e.g.*, Charles A. Wright & Arthur A. Miller, Federal Practice and Procedure § 1336.2 n.1 (collecting cases where a party, but not counsel, was sanctioned). But there still must be a predicate finding that an attorney (or unrepresented party) has violated Rule 11(b).

Here, that finding cannot be made because of a change in Cognyte's litigation strategy. Cognyte originally sought Rule 11 sanctions against both ITM and its former counsel Christopher Hinton. *See* Dkt. Nos. 80–82. And had this Court found that Mr. Hinton had violated Rule 11(b), it could then have found that Rule 11(c) sanctions were justified against ITM. But Cognyte elected to dismiss its motions for sanctions as against Mr. Hinton. Dkt. Nos. 272, 275. So there is simply no route through Rule 11 for the Court to reach the conduct of ITM.

To be fair, this discussion may be of more interest to Civil Procedure professors than to the parties. After all, this Court has awarded monetary sanctions of nearly $900,000 to Cognyte from ITM and Mr. Schehtman through an exercise of the Court's inherent authority. And without prejudging any future motions in this case, the Court finds it hard to see how adding an additional ground for sanctions under Rule 11 could change that amount, which was tied to the reasonable attorneys' fees expended by Cognyte's counsel during this litigation. Nonetheless, Cognyte is given leave, should it choose to do so, to write to the Court requesting an evidentiary hearing concerning Mr. Hinton's liability for Rule 11 sanctions (which would be a necessary prerequisite to the refiling of any Rule 11 sanctions motion). Any such letter must be filed on the Court's docket no later than 14 days following the date of this order.

## IV.   CONCLUSION

For the foregoing reasons, Cognyte's motion for sanctions pursuant to this Court's inherent authority, Dkt. No. 218, is GRANTED. ITM and Mr. Schehtman are jointly and severally liable and ordered to pay $895,397.85 to Cognyte for pursuing a knowingly frivolous claim in bad faith. *See Cmty. Television Sys., Inc. v. Caruso*, 284 F.3d 430, 437 (2d Cir. 2002). Cognyte's motion for sanctions pursuant to Rule 11, Dkt. No. 80, is DENIED.

The Clerk of Court is directed to mail a copy of this order to Mr. Schehtman and ITM.

SO ORDERED.

Dated:  October 19, 2022
New York, New York

GREGORY H. WOODS
United States District Judge